UNITED STATES, Appellee

v.

Christopher GERLICH, Airman
U.S. Air Force, Appellant.

No. 95–0759.
Crim.App. No. S28808.

U.S. Court of Appeals for
the Armed Forces.

Argued May 21, 1996.

Decided Sept. 30, 1996.

For Appellant: *Captain Harold M. Vaught* (argued); *Colonel Jay L. Cohen* and *Captain Todi S. Carnes* (on brief).

For Appellee: *Lieutenant Colonel Michael J. Breslin* (argued); *Colonel Jeffery T. Infelise* and *Captain Libby A. Brown* (on brief); *Captain Deborah M. Carr.*

*Opinion of the Court*

COX, Chief Judge:

Appellant was tried by a special court-martial with members at Royal Air Force Chicksands, England, for drunk and disorderly conduct and commission of an indecent assault, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The military judge granted a defense motion to dismiss the specification alleging drunk and disorderly conduct. Contrary to his pleas, appellant was convicted of the indecent assault. He was sentenced to a bad-conduct discharge and reduction to pay grade E–1. The convening authority approved only the bad-conduct discharge, and the Court of Criminal Appeals affirmed the findings and the approved sentence in an unpublished opinion.

We granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO DISMISS THE REMAINING SPECIFICATION FOR UNLAWFUL COMMAND INFLUENCE WHERE THE JUDGE GROUNDED HIS DENIAL ON COL MAYFIELD'S HAVING TESTIFIED CLEARLY, UNEQUIVOCALLY, AND CONVINCINGLY THAT HE DID NOT CONVENE APPELLANT'S COURT UNDER THE COMMAND INFLUENCE OF HIS BOSS, MG [Major General] LINK.

## II

WHETHER THE SPECIAL COURT–MARTIAL CONVENING AUTHORITY, WHO DIRECTED WITHDRAWAL OF NONJUDICIAL PUNISHMENT SO THAT CHARGES COULD BE REFERRED AND WHO DIRECTED THAT CHARGES THEREAFTER BE SIGNED, WAS DISQUALIFIED FROM ACTING AS THE CONVENING AUTHORITY.

## III

WHETHER THE CONVENING AUTHORITY SHOULD HAVE TAKEN POST–TRIAL ACTION SINCE HE WAS PERSONALLY INVOLVED IN THIS CASE.

The granted issues are raised in the following context. During an Article 39(a), UCMJ, 10 USC § 839(a), session, trial defense counsel moved to dismiss the sole remaining specification on the basis that unlawful command influence was the genesis of appellant's court-martial. After an evidentiary hearing on the issue, the military judge ruled that the appearance of unlawful command influence had been raised, which created a rebuttable presumption that appellant was prejudiced and "[t]hat presumption can be rebutted only by clear and convincing evidence that there was no unlawful command influence." The parties before this Court disagree as to whether the military judge utilized the proper evidentiary standard in resolving the issue of command influence. Government counsel submit that the clear-and-convincing standard is appropriate for the initial analysis to determine if the Government overcame the presumption that command influence infected the processing of a case. They argue that the beyond-a-reasonable-doubt standard is applicable only to the assessment of prejudice if that initial presumption is not resolved in favor of the Government. Contrarily, defense counsel submit that there are no intermediate steps involved in such analysis and that the beyond-a-reasonable-doubt standard must be utilized in the entire process of resolving a command-influence issue.

In *United States v. Ayala*, 43 MJ 296, 299 (1995), this Court noted that "[t]he burden of disproving the existence of unlawful command influence or proving that it did not affect the proceeding does not shift to the Government until the defense meets its burden of production." Thus, Government counsel correctly observe that the Government may overcome its burden by either proving that command influence does not exist or, assuming that it does, that an accused was not prejudiced. However, *Ayala* did not specifically discuss the burden of proof as it relates to the two factors involved in overcoming the aforementioned presumption.

Here, the military judge held that the defense had met its burden of production, but he further held that the Government had overcome the presumption by proving command influence did not exist under the standard of clear and convincing evidence.

This Court has not specifically addressed the issue of whether the evidentiary standard is different for the initial issue relating to the existence of command influence and the ultimate determination of prejudice, although the United States Navy–Marine Corps Court of Military Review has applied the clear-and-convincing standard to the initial question of whether command influence exists. *United States v. Lawson*, 33 MJ 946, 951 (1991), aff'd on other grounds, 36 MJ 415 (CMA 1993); *United States v. Jones*, 30 MJ 849 (1990). Thus, we turn to the genesis of the evidentiary presumption, *United States v. Thomas*, 22 MJ 388, 394 (CMA 1986), wherein the author of the principal opinion observed the following:

Consequently, in cases where unlawful command influence has been exercised, no reviewing court may properly affirm findings and sentence unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence.

The quoted language promulgated an evidentiary standard that was predicated on the existence of unlawful command influence and addressed the issue of potential harm to an accused. This standard in *Thomas* was,

in turn, predicated on the legal analysis involved in the finding of a constitutional violation in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which involved a harmless-error issue. Subsequent cases of this Court have not specifically delineated any distinction between the presumption of the existence of command influence and the presumption of prejudice or harm to an accused. *See United States v. Weasler,* 43 MJ 15 (1995); *United States v. Campos,* 42 MJ 253 (1995); *United States v. Reynolds,* 40 MJ 198 (CMA 1994); *United States v. Allen,* 33 MJ 209 (CMA 1991). However, we need not resolve the question here; even assuming the lower standard of clear and convincing evidence is applicable, we hold that the Government did not meet its burden of proof upon an examination of the facts presented to the military judge.

Appellant's difficulties arose when he consumed a quantity of alcohol during the evening and early morning hours of December 29 and 30, 1992. Thereafter, he was observed knocking on the doors of barracks rooms and ultimately went to the victim's dormitory room where she and her roommate were sleeping. Appellant entered the room uninvited and lay next to the victim. He then penetrated the victim's vagina with his finger. The victim woke up as a result of her roommate's screaming, and appellant was ordered to leave.

Colonel Mayfield, the special court-martial (SPCM) convening authority, and Major Shogren, a subordinate commander, testified on the motion concerning command influence. Their testimony reflects that they and a legal officer discussed the incident and, as a result of that discussion, appellant was punished under the provisions of Article 15, UCMJ, 10 USC § 815. That Article 15 proceeding included only an allegation of drunk and disorderly conduct. Colonel Mayfield testified that he had expected both offenses to be part of the Article 15 proceeding. Major Shogren, who administered the Article 15, also testified that the punishment he imposed was

meant to deal with the entire course of conduct and explained that the documents did not contain an allegation of assault because they were prepared by a legal office.[1] Therefore, it is clear that both officers were aware of the more serious offense involved in this case.

After the Article 15 was imposed, the victim had a meeting with Colonel Mayfield but no efforts to impose a court-martial were immediately forthcoming from him. Rather, subsequent to this meeting, the victim visited the 3d Air Force Inspector General (IG), Colonel Brotzman. Colonel Mayfield provided some information to Colonel Brotzman with a cover letter in which he observed:

> The personal trauma experienced by . . . [the victim] is deeply regretted—she was an innocent victim who did not deserve what happened to her. However, the circumstances surrounding the incident were extensively weighed, and I feel Gerlich was appropriately punished for his wrongdoing.

Colonel Brotzman concluded the case was not an IG matter and referred it to the general court-martial convening authority, Major General Link, by letter in which he noted:

> I have reviewed the situation with Colonel Mayfield, the SPCM authority, including the general flow of rationale leading to the Article 15. I've also viewed the original police report . . . and interviewed the victim and her first sergeant at some length.
>
> I believe military justice should punish perpetrators appropriately and serve to deter others from committing similar acts. I don't think that's been achieved in this case.

General Link, who was Colonel Mayfield's reporting officer, in turn communicated by letter with Colonel Mayfield as follows:

> 1. I have become aware of an incident which occurred on 30 December 1992. The incident involved an alleged sexual assault by AB (then AMN) [2] Christopher Gerlich. The victim of the assault believes the punishment which AB Gerlich received

---

1. We express no opinion on the propriety of imposing punishment without appropriate notice to the individual.

2. AB (Airman Basic); AMN (Airman).

was not satisfactory considering the offense.

2. I am informed AB Gerlich was administered an Article 15 consisting of only one specification—drunk and disorderly. I believe that our military justice system should punish perpetrators appropriately *and* serve to deter others from committing similar acts. Based on what I know of the incident now, I believe it's possible the Article 15 will not achieve these goals.

3. Therefore, request you consider a further investigation of the incident itself, and the larger base "climate" factors which may have been involved. This investigation could focus on answering questions such as:

a. What was the extent of AB Gerlich's alcohol consumption during the pub crawl and visit to the Consolidated Open Mess. What involvement did his supervisors have?

b. Who were "Mike, Mark, and the blonde girl" and did they invite AB Gerlich to a dorm party? What background events or attitudes have led to the accepted colloquial labeling of the dorm in question as "Easy Dorm?"

c. In the interest of a healthier overall Air Force operation at Chicksands, how can those attitudes be modified?

d. What exactly happened after AB Gerlich climbed in the bed of the victim? (More details on what happened when, reactions, etc., would be helpful.)

e. Is further action under the UCMJ called for in the specific incident in question?

4. Given that you agree further investigation is appropriate, I would welcome hearing how you decide to address not only the incident itself, but the overall living and working environment at RAF Chicksands.
s/s Charles D. Link
CHARLES D. LINK
Major General, USAF
Commander

As a result of this letter, Colonel Mayfield sought an additional investigation of the in-cident and ultimately directed Major Shogren to set aside the Article 15 proceeding. Major Shogren testified that he may have experienced a little heartburn over that direction.[3] Colonel Mayfield eventually referred the two offenses to a special court-martial.

During the processing of these subsequent actions, Colonel Mayfield sent an interim report to General Link and spoke with him via telephone concerning the case. Colonel Mayfield asserted during his testimony that he did not "feel any coercion or any pressure from the boss that we had mishandled this case so badly that we should go in a specific direction." He also acknowledged during his testimony that he had talked with General Link's staff judge advocate about the case, but that officer did not make any specific recommendations. Additionally, he acknowledged that when he received the letter from General Link he "was concerned, ... that I would get a letter from my boss about a case that we were attempting to work here at Chicksands, so ... [he] read it with earnest." Concerning General Link's reference to the Article 15 proceeding, the following colloquy occurred at trial:

Q. The second paragraph the general states, "I believe it's possible the Article 15 will not achieve these goals." Is that the type of statement that is going to cause you to end up convening a court-martial?

A. By itself, no, sir. I was a bit bothered by that comment when it first came out. I looked at that and said, "What? Is there something in here that I am missing? Is the boss trying to tell me something?" I read that several times and I perceived that statement as he is not really—He doesn't know the details of this case. He hadn't been in on this thing other than as a follow up to ... [the victim's] visit. In fact, to my knowledge he was, again, he didn't really know what all had transpired until ... [the victim] went to the vice and the vice said, "It is not an IG matter. It is more of a

___

3. Major Shogren also declined to sign the charge when requested to do so.

command matter." But that particular sentence in there, I wondered initially. I mean, there is no question about it. What is the boss trying to say? Is he trying to say anything on this? I came to the conclusion that I didn't see that as a threat. No. I looked at it as him saying, "Based upon what I know about this thing right now, is this the proper—" It was a simple question. It was an innocent question and certainly not a coercive, pressure question, I didn't think. I feel very comfortable to this day if I had gone back and said, "Sir, I feel nothing ought to change whatsoever on this," that that would not be looked at unfavorably or there would be, I guess, any derogatory feeling toward me by the boss. I didn't really make the decision until long after this letter came. In fact it was the first week in this month.

Although Colonel Mayfield acknowledged during his testimony that, regarding the additional investigation, "in some respects not a tremendous amount of additional information came out in terms of the sequence of events that we thought happened that night," he explained that his decision to change the nature of the proceeding was based on the fact that he had not previously appreciated the devastation of the victim in this case. He also explained that the additional investigation did not confirm the existence of "Mike, Mark and the blonde girl,"[4] and it did allow them to learn "a little bit better the amount of alcohol that [appellant] had consumed." Finally, we note the following colloquy between the military judge and Colonel Mayfield concerning General Link's letter:

Q. Without the general's letter, would you have gone back and reopened this case and find ourselves sitting in this courtroom today? Probably not?

A. I am not sure whether we would have gone back or not. I probably would

have been comfortable at that point in time with the way we had approached it. I look back now in retrospect and I ask myself the question, "Would that have been the right thing to do?" I am not sure the answer to that would be yes.

Thus, it is clear from Colonel Mayfield's own testimony that he concluded that an Article 15 proceeding was appropriate and adhered to this view after discussing the incident with the victim and subsequently so advised the IG of this viewpoint. Only after receiving a letter from his superior did he conclude that some reexamination of his position was appropriate. Although he asserted that he was exercising his independent judgment when he concluded that a special court-martial was a more appropriate forum, we have previously recognized the difficulty of a subordinate ascertaining for himself or herself the actual influence a superior has on that subordinate. *United States v. Rosser*, 6 MJ 267, 272 (CMA 1979); *United States v. Zagar*, 5 USCMA 410, 18 CMR 34 (1955); *United States v. Adamiak*, 4 USCMA 412, 15 CMR 412 (1954); *see also United States v. Hagen*, 25 MJ 78, 86–88 (CMA 1987)(Sullivan, J., concurring) (case actually involved a claim of selective prosecution but nonetheless clearly presents the position of this Court on the subject of command influence). Furthermore, unlike *United States v. Wallace*, 39 MJ 284 (CMA 1994), the subordinate officer was aware of the full scope of appellant's activities prior to receiving a letter from his superior officer. He sought to explain his change of direction by the failure to confirm a barroom conversation that did not involve the victim in this case and an examination of the quantity of alcohol consumed by appellant, although it was clear appellant was intoxicated. We are not convinced the Government met its burden of proof in this case.

4. We are somewhat perplexed by this reference. Apparently Colonel Mayfield was told that appellant was engaged in a conversation in a bar with these individuals, which suggested that appellant may have anticipated some favorable response to his sexual advances toward the blonde girl. However, even if this were true, there is nothing to suggest that the victim in this case was in any manner involved in those activities.

The decision of the United States Air Force Court of Criminal Appeals is reversed, and the findings of guilty and the sentence are set aside.[5] The record of trial is returned to the Judge Advocate General of the Air Force for submission of this case to another convening authority for a determination as to whether this case should be re-referred to a court-martial.

Judges SULLIVAN and GIERKE and Senior Judge EVERETT concur.

CRAWFORD, Judge (dissenting):

The majority sets aside two findings of fact without concluding that either was clearly erroneous or unsupported by the record. *See United States v. Wallace*, 39 MJ 284, 286 (CMA 1994). The majority's message to superior commanders appears to be that they may not exercise responsible command leadership by suggesting reconsideration of a particular disposition of a case. Instead, the only option is to forward the case to the superior commander for action.

5. In view of our disposition of Issue I, we do not resolve Issues II and III.