UNITED STATES, Appellee

v.

John S. STONEMAN, Specialist
U.S. Army, Appellant

No. 01-0295

Crim. App. No. 9800137

United States Court of Appeals for the Armed Forces

Argued January 22, 2002

Decided July 5, 2002

GIERKE, J., delivered the opinion of the Court, in which
EFFRON and BAKER, JJ., and SULLIVAN, S.J., joined.
SULLIVAN, S.J., filed a concurring opinion.
CRAWFORD, C.J., filed a dissenting opinion.

Counsel

For Appellant:  Captain Sean S. Park (argued); Colonel Adele H.
   Odegard, Lieutenant Colonel E. Allen Chandler, Jr., and Major
   Imogene M. Jamison (on brief); Lieutenant Colonel David A.
   Mayfield.

For Appellee:  Captain Paul T. Cygnarowicz (argued); Colonel
   Steven T. Salata, Lieutenant Colonel Paul H. Turney, and
   Major Anthony P. Nicastro (on brief).

Military Judges:  Stephen V. Saynisch and Debra L. Boudreau

**This opinion is subject to editorial correction before final publication.**

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of raping and sodomizing a child under the age of sixteen, in violation of Articles 120 and 125, Uniform Code of Military Justice (UCMJ), 10 USC §§ 920 and 925, respectively. The adjudged and approved sentence provides for a bad-conduct discharge, confinement for seventy-eight months, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 54 MJ 664 (2000).

This Court granted review of the following issues:

I. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING THE DEFENSE'S MOTION TO STAY THE PROCEEDINGS UNTIL THE PANEL WAS PROPERLY SELECTED SO AS NOT TO INCLUDE THE MEMBERS OF THE FIRST BRIGADE WHO RECEIVED AN E-MAIL FROM THE BRIGADE COMMANDER, AND/OR ATTENDED THE RELATED BRIEFING IN WHICH THE COMMANDER STATED HIS INTENT TO "CRUSH" THOSE WHO DID NOT LIVE UP TO A CERTAIN STANDARD.

II. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY FAILING TO SHIFT THE BURDEN TO THE GOVERNMENT ONCE THE DEFENSE ESTABLISHED A CASE OF UNLAWFUL COMMAND INFLUENCE BY MAKING A WRITTEN MOTION, APPENDING AN INCRIMINATING E-MAIL MESSAGE TO THE MOTION, AND PROFERRING TESTIMONY OF A WITNESS TO A BRIEFING AT WHICH THE BRIGADE COMMANDER MADE INAPPROPRIATE COMMENTS ABOUT DISCIPLINE IN THE PRESENCE OF SEVERAL COURT MEMBERS.

III. WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED IN ATTEMPTING TO "RECREATE" THE UNLAWFUL COMMAND INFLUENCE HEARING THAT THE MILITARY JUDGE SHOULD HAVE CONDUCTED.

IV. WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED IN HOLDING THAT THE MILITARY JUDGE DID NOT ABUSE HER DISCRETION BY DENYING THE DEFENSE'S CHALLENGE FOR CAUSE AGAINST PANEL MEMBERS WHO RECEIVED AN E-MAIL MESSAGE FROM THEIR BRIGADE COMMANDER THAT CONTAINED STATEMENTS REGARDING HIS INTENT TO "CRUSH" THOSE WHO DID NOT LIVE UP TO A CERTAIN STANDARD.

For the reasons set out below, we remand for further proceedings.

Background

Appellant was a member of Headquarters and Headquarters Company, 1st Battalion, 17th Infantry, a subordinate unit of the 1st Brigade, 6th Infantry Division (Light).  On December 21, 1997, Colonel (COL) Brook, the brigade commander, sent an e-mail to the brigade leadership and supporting unit commanders, notifying them of mandatory leaders' training on December 23, 1997.  The e-mail informed all battalion and company commanders that he expected them "to ensure the following happens after [his] leader training":

(1) "Declare war on all leaders not leading by example, both on and off duty," and inform them that failure to lead by example "will result in relief, negative [evaluation reports]; or UCMJ action."

(2) Develop a unit plan for "ZERO DUIs [driving under the influence] during the holiday period";

(3) "Ensure EVERY single soldier, or geographical batchelor [sic], in the Brigade is invited over to someone's home, or the unit is having a special barracks function" on Christmas Day;

(4) "Ensure all new soldiers . . . are integrated into the unit, and NOT being treated as the 'FNG' [f------ new guy] prior to Christmas.  If you don't' have a good integration plan for the new soldiers, you will have a rash of problems, DUIs, etc. over the holiday period.  Be proactive, and ensure this doesn't happen."

COL Brook then articulated his leadership philosophy, including the following comments:

3

> I am sick of leaders who are leaders by virtue of their rank only.  My New Years Resolution is to CRUSH all leaders in this Brigade who don't lead by example, on and off duty.  Leaders must focus on developing their REFERENT power, the power given to them by subordinates who respect them because of caring competent leadership, rather than their LEGAL power, which is the power they have by virtue of their rank.

> \* \* \*

> I'm sick of leaders getting DUIs, abusing their position, being lazy, not achieving [Brigade physical training] standards, taking the easy way out regarding safety, and never going the extra mile.  I'm sick of encountering leaders who could care less about soldiers, and are SELF CENTERED pukes.  I am sick of hearing about leaders who are morally and spiritually bankrupt.  I am declaring war on leaders like this, because they don't deserve to be leaders of America's sons and daughters, and they are not doing what the American taxpayer expects them to do.

> \* \* \*

> . . . If leaders don't lead by example, and practice self-discipline, then the very soul of our Army is at risk.  No more [platoon sergeants] getting DUIs, no more NCOs [noncommissioned officers] raping female soldiers, no more E7s coming up "hot" for coke, no more stolen equipment, no more "lost" equipment, no more approved personnel actions for leaders with less than 260 APFT [Army physical fitness test scores], no more leader APFT failures at [Department of the Army] schools, --- all of this is BULLSHIT, and I'm going to CRUSH leaders who fail to lead by example, both on and off duty.

54 MJ at 676.

On January 9, 1998, COL Brook sent a second e-mail, stating that nothing in his previous e-mail was intended to suggest specific actions for leadership failures.  He informed his commanders that appropriate action for particular cases was defined as "what each individual commander . . . deem[ed] so in the exercise of independent discretion."  COL Brook further stated:

> . . . Nothing in what I have said in this or the
> earlier e-mail, or what I said at the Leader Training,
> has anything to do with what any soldier does as a
> member of a court-martial panel or as a witness before
> a court-martial. The sworn duty of any court-martial
> panel member is to follow the instructions of the
> military judge, apply law to admissible facts, and
> decide a sentence based solely on the evidence
> presented in court. Nothing said outside a
> court-martial by anybody, TO INCLUDE ME, may have any
> bearing on the outcome of any given case or sentence.

Id. at 678.

On January 22, 1998, defense counsel submitted a motion to the military judge asking her to stay the proceedings until all members of the 1st Brigade were removed from the panel. The defense asserted that several NCOs perceived COL Brook's message to be "that leaders who found themselves in trouble needed to be 'crushed.'" The defense proffered the testimony of Staff Sergeant (SSG) Mallerard that no one present at the leaders' training "ha[d] any doubt what COL Brook meant to get across -- that is, crush these soldiers that get into trouble." The defense asserted that the members of the brigade should be removed from the court-martial panel for implied bias. The defense conceded that the unlawful command influence only affected court members from the 1st Brigade, and not potential witnesses.

When appellant's court-martial convened on January 25, 1998, the military judge ruled that the request for a stay was premature, because any issues involving unlawful command influence could be addressed during individual voir dire. During group voir dire, five of the nine members of the panel acknowledged seeing an e-mail regarding disciplinary problems

within the brigade. The members were then questioned individually.

Lieutenant Colonel (LTC) Saul was COL Brook's second in command and had assumed command of the brigade on three occasions in COL Brook's absence. He recalled that COL Brook's first e-mail suggested "the appearance of a lack of law and order among certain elements of the brigade." He thought that the message was directed at all enlisted members of the brigade. He described the leaders' training session on December 23 as follows:

> [A] discussion, a monologue from the brigade commander, in regards that a series of criminal acts or violations of the law, to include a number of driving under the influence or drunk driving cases; there was reference to a rape of a female enlisted soldier by a noncommissioned officer; some details were discussed in that case; and a general perception on the part of the brigade commander was that there was an element within the brigade that violation of the law was common.

The only guidance that LTC Saul recalled was "a tightening up of the chain of command and enforcement of discipline and standards." LTC Saul had no recollection of the second e-mail message.

LTC Saul told the military judge that he did not think that COL Brook's actions had any impact on him as a court member. He did not perceive COL Brook's actions as an "exhortation to . . . be tough in this case."

LTC Withers, the brigade executive officer, perceived the first e-mail as "aimed at the leaders," addressing "the problems we had had with discipline," and "urging leaders not to accept

substandard performance, especially by leaders." He recalled that the e-mail "made a statement that leaders should scrunch or squash, or something, NCOs especially and other officers, who committed crimes, had a DUI, something like that."

LTC Withers recalled that the December 23 leaders' training had "[c]ertainly the same tone, the same subject matter." He explained:

> The brigade had had several DUIs, there was a rash of DUIs; it was an attention getter, trying to get people to wake up and realize the seriousness of DUIs and so he was talking that leaders should exhibit a higher standard, and any leader who did something like that it was questionable if they should be around.

LTC Withers perceived the second e-mail as an attempt to clarify the first, and to make it clear that the first e-mail "was not in any way, shape or form, intended to make us -- or to inhibit his subordinates in the proper handling of UCMJ and other legal matters." When asked if COL Brook's actions would affect his performance as a court member, he responded, "Not at all." He explained:

> Colonel Brook is a very impassioned man; he holds his values very high; he shoots from the hip; he knows he shoots from the hip. I had talked to him about that and a wide variety of subjects. I've been in the Army long enough to have seen statements like that before; and quite frankly I've been in the Army so long that I'm not really concerned at this point what my rater thinks; I'm going to do what I think is right, because that's what I've done all my career.

LTC Moody commanded an aviation battalion that supported the 1st Brigade but was not part of it. He stated that he probably read the e-mail messages because he receives a courtesy copy of brigade correspondence. He recalled that the message "may have had something to do with accountability, integrity." He stated

that he respects COL Brook, "but he's not my brigade commander." LTC Moody was invited to the leadership training but did not attend.

Command Sergeant Major (CSM) Pagan was the brigade command sergeant major.  Although he worked directly for COL Brook, he did not participate in the drafting of the e-mail messages.  His perception of the first e-mail was as follows:

> [J]ust trying to convey to everybody how serious these situations are, and that we should do everything in our power as leaders to make sure that we're talking to our soldiers about all the pitfalls that are out there awaiting you, and keep these things in mind and convey that to the soldiers so that they're thinking about that, those situations; the situation that could happen to them, or either -- DUIs, or putting themselves in a compromising situation, so forth and so on.  And trying to prevent people from getting into trouble.

Asked whether he thought the e-mail told him what he should do when "confronted with someone who is in trouble," he responded, "No, not at all."  CSM Pagan had no recollection of the second e-mail.

CSM Pagan was asked to comment on the first e-mail, and he responded:

> [H]e was thinking about a few leaders out there at different levels, and that he probably overreacted and put it on e-mail.  He shot from the hip, versus talking to somebody else and maybe let them, kind of, see what he was writing and maybe say "Hey sir, you need to calm that down a little bit."

CSM Pagan believed that COL Brook sent the same message at the December 23 leaders' training.  He believed that the briefing "covered all soldiers from Private to Colonel."  However, he thought that the tone of the briefing "was completely different." At the briefing, "it was an upbeat tone by [Col Brook], and it

was more on the verge of 'Let me tell you how I can keep you and your soldiers out of trouble.'"

When the military judge asked CSM Pagan whether one of the civilian spectators in the courtroom could be assured that he would be a fair and impartial court member, he responded:

> Well, I've been a fair and impartial member of the United States Army, as well as my nation, serving for close to 25 years; and I'm not one to be swayed, I'm not one to comply with something just because somebody else said it. I'll stick by my guns and come to the conclusion that I feel is appropriate; no matter who's in that group, or in this members [sic] of the jury; I will take all the information that's given to me, make a rational decision, evaluate all that information, and I will make the best decision that I see possible with that information, and listening to others that have an opinion on that subject.

Master Sergeant (MSG) Peele was the brigade chemical NCO. He stated that he read some of the first e-mail, and "what [he] got out of it was about the incidents about the drunk driving and things like that." He did not think that the e-mail conveyed any message to him that he "didn't already have in [his] mind about drunk driving." He did not think that it gave him any guidance about being a leader. He disagreed with the focus of the leaders' training. Regarding his duties as a court member, he told the military judge, "I don't need a Colonel to tell me now to do my duties, ma'am, I can do them on my own; and I think that he could take a message from me" regarding the treatment of soldiers in the brigade. MSG Peele thought that racism and the standards of treatment of soldiers in the brigade were more appropriate issues than focusing on DUI. Asked by defense counsel what effect the message had on him, MSG Peele responded:

> Well, if you're doing your job, sir, everyday like you should be doing, as I do, I feel it had no affect [sic] on me. It does affect me to the point of you can't tell me to lead by example if you don't do it; and that's just my opinion, sir.

MSG Peele did not see the second e-mail.

Sergeant First Class (SFC) Robbins, a member of appellant's battalion, did not see either e-mail, but he did attend the leaders' training on December 23. He told the military judge that he did not think the December 23 briefing had any bearing on his court-martial duties.

The military judge denied the motion for a stay and the defense challenges for cause based on implied bias. She explained:

> I've read United States versus Youngblood, [47 M.J. 338 (1997)], and I certainly agree with the court in that case that implied bias is critical and it's reviewed through the eyes of the public; but if it was reviewed through the eyes of the public the responses that the court members gave, if members of the public were sitting in the back of the courtroom and heard their responses given on voir dire by the members of 1st Brigade who have been selected to serve in this court-martial, I think they would see that these members represent the finest traditions of the United States Army as court members, and would certainly not be swayed by anything Colonel Brook might say; they viewed his comments as being intemperate, and I think that everyone heard them say loudly and clearly that they will discharge their responsibilities as court members and vote in accordance with their conscience.

Defense counsel later challenged LTC Saul for cause on several grounds, including his answers on voir dire about COL Brook's message. The military judge granted the challenge, explaining:

> In the interest of granting challenge[s] for cause liberally, based upon my observations as well of Lieutenant Colonel Saul, he was the only one that didn't take great pains to

10

> distance himself from Colonel Brook's
> comments; he was the only one who believed
> that, I think, the message extended to all
> soldiers, including those at the Private
> level.

A defense challenge for cause against CSM Pagan was granted on multiple grounds, including a recent conflict with defense counsel. After challenges, four members of the 1st Brigade remained on the panel: LTC Withers, LTC Moody, MSG Peele, and SFC Robbins.

The Court of Criminal Appeals held that the military judge did not err by declining to rule on the motion for a stay until after voir dire. 54 MJ at 671. It held that she did not abuse her discretion by denying the implied bias challenges. Id. at 673. It noted that she "never articulated whether, under command influence law, the appellant had met his initial burden to show facts constituting unlawful command influence that were logically connected to the court-martial, and which had the potential to cause unfairness in the proceedings, thereby shifting the burden of proof to the government." Id.; see United States v. Biagase, 50 MJ 143, 150 (1999). Instead, the military judge based her ruling "purely on the law of causal challenges." Id. The court below held that any error based on failure to apply the burden-shifting mandated by Biagase was harmless. Id.

The court below also noted that the military judge "did not make any specific findings of fact as to the content of the leaders' training or conclusions of law as to whether COL Brook's comments constituted unlawful command influence." It found this omission harmless. Id. at 674.

The court below then conducted a de novo review of the record to determine whether the trial was tainted by unlawful command influence. Based on the members' responses during voir dire, the court concluded that COL Brook "did not attempt to coerce or, by any unauthorized means, influence the action" of the court-martial. Id., quoting Art. 37, UCMJ, 10 USC § 837. The court agreed that COL Brook was "shoot[ing] from the hip," that his language was intemperate, and that his comments "may have been inappropriate," but it held that his comments were not unlawful. Id. The court below concluded "beyond a reasonable doubt that the findings and sentence in the appellant's case were not affected by COL Brook's e-mails and leaders' training." Id.

## Discussion

Appellant asserts that the military judge erred by failing to stay the proceedings, by misapplying the test for implied bias based on unlawful command influence, by failing to hold a hearing on the issue of unlawful command influence, and by failing to shift the burden of proof to the Government as required by Biagase, supra. Appellant also asserts that the court below erred when it "recreated" the hearing that the military judge should have conducted. The Government asserts that the military judge correctly denied the challenges founded on implied bias, and that the court below correctly determined, after a de novo review of the record, that appellant failed to establish unlawful command influence.

Unlawful command influence is "the mortal enemy of military justice." United States v. Thomas, 22 MJ 388, 393 (CMA 1986). On appeal, this Court reviews de novo the question whether the

12

facts constitute unlawful command influence. United States v. Johnson, 54 MJ 32, 34 (2000). Once the issue has been raised, the Government must persuade this Court beyond a reasonable doubt either that there was no unlawful command influence or that the proceedings were untainted. Biagase, supra; Thomas, supra.

In Thomas, supra at 396, this Court placed the burden on defense counsel, trial counsel, and the military judge to "fully question the court members during voir dire" to determine whether a commander's comments "had an adverse impact on the member's ability to render an impartial judgment." This Court recognized, however, that in some cases, voir dire may not be enough, and that witnesses may be required to testify on the issue of unlawful command influence.

In Youngblood, supra, relied on by the military judge in this case, this Court held that the military judge erred by denying challenges for cause based on unlawful command influence. Youngblood was decided as an implied bias case, not an unlawful command influence case. Because this Court did not reach the question whether unlawful command influence was raised, it did not apply the burden-shifting analysis set out in its later Biagase decision. 47 MJ at 339.

In Biagase, this Court set out the analytical framework for resolving claims of unlawful command influence. At trial, the initial burden is on the defense to "raise" the issue. The burden of proof is low, but more than mere allegation or speculation. The quantum of evidence required to raise unlawful command influence is "some evidence." 50 MJ at 150.

The defense must show facts that, if true, constitute unlawful command influence, and it must show that the unlawful command influence has a logical connection to the court-martial in terms of potential to cause unfairness in the proceedings. If the defense shows such facts by "some evidence," the issue is raised. Id.

Once the issue is raised, the burden shifts to the Government. Id. The Government may show either that there was no unlawful command influence or that any unlawful command influence did not taint the proceedings. If the Government elects to show that there was no unlawful command influence, it may do so either by disproving the predicate facts on which the allegation of unlawful command influence is based, or by persuading the military judge that the facts do not constitute unlawful command influence. The Government also may choose to not disprove the existence of unlawful command influence but to prove that it will not affect the proceedings. Whichever tactic the Government chooses, the quantum of evidence required is proof beyond a reasonable doubt. Id. at 151.

Unlike the law pertaining to unlawful command influence, there is no burden shifting in the law pertaining to challenges. RCM 912(f)(3), Manual for Courts-Martial, United States (2000 ed.),[1] places the burden of establishing the grounds for challenge on the challenging party. However, RCM 912(f)(3) does not define the quantum of proof required to establish a ground

---

[1] This Manual provision is identical to the one in effect at the time of appellant's court-martial.

for challenge.  This Court has not addressed the quantum of proof required under Rule 912(f)(3), and we need not precisely define it in this case.  We are satisfied, however, that the quantum of proof required under RCM 912(f)(3) is higher than the "some evidence" required to raise an issue of unlawful command influence.  Thus, a military judge's determination that the defense has not sustained the greater burden of establishing a challenge under RCM 912(f)(3) does not answer the question whether the defense has met the lesser burden of presenting "some evidence" of unlawful command influence, thereby shifting the burden to the Government.

As noted by the court below, the military judge did not make findings of fact and conclusions of law, nor did she analyze the evidence in accordance with the Biagase framework.[2]  54 MJ at 673-74.  Thus, the question before us is whether the lower

---

[2] The dissent notes that Biagase was decided after appellant's trial.  However, the Biagase decision, which then-Judge Crawford joined, did not establish a new requirement for making findings of fact and conclusions of law or otherwise announce new law; it merely synthesized this Court's jurisprudence and established an analytical framework for resolving issues of unlawful command influence.  Long before Biagase, this Court recognized that unlawful command influence involves questions of fact as well as questions of law.  Once the issue is raised, a military judge must determine the facts and then decide whether those facts constitute unlawful command influence.  See United States v. Gerlich, 45 MJ 309, 310-11 (1996); United States v. Ayala, 43 MJ 296, 299 (1995); United States v. Stombaugh, 40 MJ 208, 213-14 (CMA 1994).  The "some evidence" standard was set out in Ayala, supra at 300.  The burden-shifting was set out in Gerlich, supra at 310.  The requirement to prove beyond a reasonable doubt that the proceedings were unaffected by unlawful command influence was announced in United States v. Thomas, 22 MJ 388, 394 (CMA 1986).

court's de novo review of the record and its analysis under the Biagase framework are an adequate substitute for a hearing at the trial level and are sufficient to ensure that this case was not tainted by unlawful command influence.  We hold that further proceedings are necessary to determine if the court-martial was tainted.

In United States v. Ginn, 47 MJ 236, 242 (1997), this Court concluded that Congress intended the Courts of Criminal Appeals "to act as factfinder in an appellate-review capacity and not in the first instance as a trial court."  In this case, there was no factfinding hearing, and no analysis under the Biagase framework at the trial level.  As a result, there are no trial-level findings of fact regarding the content, tone, and impact of COL Brook's leadership training session on December 23.  We cannot determine if additional witnesses would shed light on the issue.  In this regard, we note that the defense proffered the testimony of SSG Mallerard, the brigade training NCO, but the military judge did not act on that proffer.

Finally, the record of trial does not provide an appellate court the opportunity to observe the demeanor of the court members.  This Court has long recognized that, once unlawful command influence is raised, "we believe it incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings."  United States v. Rosser, 6 MJ 267, 271 (CMA 1979).  Accordingly, disposition of an issue of unlawful command influence falls short if it "fails to take into

16

consideration the concern of Congress and this Court in eliminating even the appearance of unlawful command influence at courts-martial." Id.; see United States v. Ayers, 54 MJ 85, 94-95 (2000), quoting United States v. Allen, 33 MJ 209, 212 (CMA 1991) ("[T]he appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial.").

The question whether there is an appearance of unlawful command influence is similar in one respect to the question whether there is implied bias, because both are judged objectively, through the eyes of the community. In the implied bias area, this Court has recognized that "[o]bservation of the member's demeanor may inform judgments" about the public perception of the fairness of a trial. United States v. Downing, 56 MJ 419, 422 (2002). While demeanor is "[a] measure of actual bias," it is "also relevant to an objective observer's consideration." Id. at 423. On an issue as sensitive as unlawful command influence, evaluation of demeanor of the court members as well as other witnesses, viewed through the prism of Biagase and the presumption of prejudice, is critical to evaluate whether there is an objective appearance of unfairness. Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an "intolerable strain on public perception of the military justice system." See United States v. Wiesen, 56 MJ 172, 175 (2001). For these reasons, we conclude that a hearing before a military judge is necessary to resolve appellant's claim of unlawful command influence.

## Decision

The decision of the United States Army Court of Criminal Appeals is set aside.  The record of trial is returned to the Judge Advocate General of the Army for submission to a convening authority for a hearing on appellant's claim of unlawful command influence under United States v. DuBay, 17 USCMA 147, 37 CMR 411 (1967).  If a hearing is impracticable, the convening authority may set aside the findings and sentence and order a rehearing or dismiss the charges.  If a hearing is conducted, the record of trial, including the hearing, will then be transmitted to the Court of Criminal Appeals for review under Article 66, UCMJ, 10 USC § 866.  Thereafter, Article 67, UCMJ, 10 USC § 867, shall apply.

United States v. Stoneman, No. 01-0295/AR

SULLIVAN, Senior Judge (concurring):

I agree with the majority.  This is consistent with my position in United States v. Youngblood, 47 MJ 338, 342-43 (1997)(Sullivan, J., concurring in part and dissenting in part) (the real issue is unlawful command influence, not jury bias).

United States v. Stoneman, No. 01-0295/AR

CRAWFORD, Chief Judge (dissenting):

The majority chastises the military judge because she did not make "findings of fact and conclusions of law, nor did she analyze the evidence in accordance with the Biagase framework." ___ MJ at (15). I do not find this "failure" surprising or erroneous since the court-martial that tried appellant took place fifteen months before this Court rendered its decision in United States v. Biagase, 50 MJ 143 (1999), setting forth a framework for analyzing questions of unlawful command influence. Although the clairvoyance which the majority apparently demands of trial judges was not present in this case, I believe the trial judge properly applied the law in rejecting appellant's challenge to those members who were subjected to COL Brook's e-mail and December 23, 1997, leadership class.

At the time of trial, the law was clear. As with pretrial publicity, see Sheppard v. Maxwell, 384 U.S. 333 (1966), the party raising an unlawful command influence motion had to show the impact on the jurors or panel members. United States v. Thomas, 22 MJ 388 (CMA 1986). Where there was an allegation of command influence,

> an appellant [had to] (1) 'allege[] sufficient
> facts which, if true, constitute unlawful command
> influence'; (2) show that the proceedings were
> unfair; and (3) show that the unlawful command
> influence was the proximate cause of that
> [alleged] unfairness.

United States v. Stoneman, No. 01-0295/AR

United States v. Stombaugh, 40 MJ 208, 213 (CMA 1994), citing

United States v. Levite, 25 MJ 334, 341 (CMA 1987)(Cox, J.,

concurring); see also United States v. Lorenzen, 47 MJ 8, 15

(1997).

We made it crystal clear in Thomas, supra at 396, that

> [i]n determining whether an accused's trial
> in a contested case before court members was
> adversely affected by command influence, we first
> consider the impact that such activities and
> communications may have had on the court members.
> In this regard, we place the burden upon both
> defense and trial counsel, as well as the military
> judge, to fully question the court members during
> voir dire and to determine thereby whether any of the
> members had knowledge of the commander's comments and,
> if so, whether the comments had an adverse impact on
> the member's ability to render an impartial judgment.
> When required, witnesses may be called to testify on
> this issue. United States v. Karlson, 16 MJ 469 (CMA
> 1983). However, we are not prepared to disqualify
> members of a court-martial panel simply because they
> were assigned or were in close proximity to the
> command where the comments were made. To do so would
> ignore the members' oath to adhere to the military
> judge's instructions and to determine the facts in
> accordance therewith. Cf. United States v. Garwood,
> 20 MJ 148 (CMA 1985).

<u>VOIR DIRE</u>

The judge permitted an extensive voir dire of all the

members. In the preliminary instructions, the judge reminded

the members that their decision should be based on the law and

instructions given during the case that appellant was presumed

to be innocent and the Government had the burden of proof.

Lieutenant Colonel (LTC) Withers, LTC Saul, LTC Moody, Master

2

Sergeant (MSG) Peele, and Command Sergeant Major (CSM) Pagan indicated they were aware of e-mail messages from the First Brigade.  All of the members also indicated they were not "aware of anything at all that might raise a substantial question concerning [their] participation in this trial as a court member."

On individual <u>voir</u> <u>dire</u>, LTC Saul stated that he remembered the first e-mail message from COL Brook but did not "recall the specifics."  He remembered that this e-mail was aimed at "tightening up of the chain of command and enforcement of discipline and standards ...."  His recollection was that "there was the appearance of a lack of law and order and discipline among certain elements of the brigade."  As to the "certain elements," he meant "enlisted personnel and noncommissioned officers."  He stated that he "saw the second message ... but [did not] recall any specific points in the second message."  He did not read the e-mail as an "exhortation to ... be tough in this case."  He agreed that any decision must be based on the evidence presented and the judge's instructions, and that such instructions override any information received from the brigade commander.  He would not "bump" up the punishment, but would base it only on the evidence presented.  As the majority notes, LTC Saul was challenged for cause, and the military judge granted that challenge.

LTC Withers, as did LTC Saul, responded to voir dire questions based on recollection, without that recollection being refreshed by the e-mails. He emphasized that the e-mails were aimed at "urging leaders not to accept substandard performance...." He said the follow-up e-mail was meant to "clarify his statement, I think the real key statement was the one to squash people who did something wrong. It was not in any way, shape or form, intended to make us -- or to inhibit his subordinates in the proper handling of UCMJ and other legal matters." "[S]itting as a member," there was nothing in the e-mail messages that would cause him "to hesitate in fulfilling [his] duty as a court member." He would not be concerned about what COL Brook would think about his performance in this case or any other case. He would not be influenced by the e-mail because

> [COL] Brook is a very impassioned man; he holds his values very high; he shoots from the hip; he knows he shoots from the hip. I had talked to him about that and a wide variety of subjects. I've been in the Army long enough to have seen statements like that before; and quite frankly I've been in the Army so long that I'm not really concerned at this point what my rater thinks; I'm going to do what I think is right, because that's what I've done all my career.

After that response, the defense counsel had no more questions.

As the majority notes, LTC Moody indicated that he read the e-mail in a cursory manner and did not attend the follow-up

4

briefing.  Major (MAJ) Fields, another court member, did not have any information about the e-mails.

The brigade's top noncommissioned officer, CSM Pagan, stated that he saw a lot of e-mail on a daily basis, and that he did not remember that e-mail conveying anything about his responsibilities as a court member.  He saw the second e-mail but did not recall it.  He added:

> You know, I've worked for quite a few brigade commanders since being a Command Sergeant Major, and knowing Colonel Brook, as well as those other commanders in the past; I tell you, knowing him, when he sent out that e-mail message and when he talked to soldiers he was looking after the welfare of the leaders, as well as the soldiers, and trying to keep them from getting themselves into trouble; and that was his thoughts on that.
>
> * * *
>
> MJ [MILITARY JUDGE]:  Sergeant Major, it looks like we've got some civilians sitting in the back of the courtroom; I know that you received this message and have had the briefing; how can you assure them that you'll be a fair and impartial court member?
>
> MBR [CSM PAGAN]:  Well, I've been a fair and impartial member of the United States Army, as well as my nation, serving for close to 25 years; and I'm not one to be swayed, I'm not one to comply with something just because somebody else said it. I'll stick by my guns and come to the conclusion that I feel is appropriate; no matter who's in that group, or in this members [sic] of the jury; I will take all the information that's given to me, make a rational decision, evaluate all that information, and I will make the best decision that I see possible with that information, and listening to others that have an opinion on that subject.

CSM Pagan had a follow-up briefing with the noncommissioned officers of his brigade following COL Brook's briefing. He could not remember the exact words he used during the briefing, "but it was about basically ensuring that they did the right things, talk to their soldiers, mentored their leaders." Compared to the 10th Mountain Division, where he was a Battalion Sergeant Major, the instances of misconduct in his current brigade were "very small." After being read part of the e-mail, CSM Pagan said COL Brook was shooting from the hip and "overreacted." CSM Pagan further stated:

> He was really looking after the – trying to look after the soldiers, by making sure that he, kind of, emphasized to the leaders "Hey, I want you to be proactive, I want you to go out there and talk to your soldiers, I want you to make sure that you're communicating with your subordinates, because that will keep soldiers out of trouble." That's what he really wanted to say. He was a little more strong in his method of delivery there, but....

The military judge also sustained appellant's causal challenge of CSM Pagan.

MSG Peele did not interpret the December briefing as a need to be tough as a court member. He thought there were more important issues than DUI. He received the first message but did not read it "because [he] knew those things already." He did not receive the second e-mail. Obviously, the messages had no effect on him.

6

MSG Geyer, another court member, responded that he could set aside any pretrial knowledge about the case he had gained from the media and base his decision solely on the evidence introduced at trial. He did not receive the first e-mail because he was not assigned to COL Brook's brigade. Although MSG Geyer was the only noncommissioned officer not exposed to the brigade commander's written or oral remarks, he was successfully challenged by the defense.

Sergeant First Class (SFC) Robbins, a member of appellant's battalion, said he did not see either e-mail but he did attend a leader's training briefing on December 23, 1997. As noted by the majority, SFC Robbins stated that the session had no bearing on his court-martial duties.

### DISCUSSION

The majority errs in two significant ways. First, it indicates that the burden on the defense is merely to present "some evidence," and that alone is sufficient to raise command influence. ___ MJ at (14). While the majority gives no indication whether "some" means colorable evidence or a different evidentiary standard, Stombaugh makes it clear that more than "some evidence" is required to shift the burden to the Government. 40 MJ at 213. We have previously rejected "[command influence] in the air," United States v. Allen, 33 MJ 209, 212 (CMA 1991), cert. denied, 503 U.S. 936 (1992), yet the

7

majority's definition of "some evidence" would certainly encompass such ethereal notions.  <u>Stombaugh</u>, however, required an appellant to "allege[] sufficient facts which, if true, constitute unlawful command influence" before any burden shifted to the Government to disprove the facts or show that the facts did not constitute command influence.  40 MJ at 213, quoting <u>Levite</u>, 25 MJ at 341 (Cox, J., concurring).  Appellant has failed to clear the first hurdle.

Even under the <u>Biagase</u> standard, the defense is required to do more than raise an allegation of unlawful command influence. It must "show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings."  50 MJ at 150.

Second, the majority stretches the holding of <u>Thomas</u>, 22 MJ at 388, beyond its intended limits by implying that witnesses are required to testify on the issue of command influence.  ___ MJ at <u>(13)</u>.  <u>Thomas</u> established no such requirement.  However, in looking at the statements given by the prospective court members under oath during <u>voir</u> <u>dire</u>, I conclude that the trial judge was in the best position to observe the court members' demeanor during their examination <u>under oath</u>; to evaluate their answers; and to determine who was and who was not improperly and adversely affected by COL Brook.  That military judge's ruling

8

denying a challenge for cause ought to be overturned only for a clear abuse of discretion.  See United States v. Downing, 56 MJ 419, 423 (2002)(Crawford, C.J., concurring in part and in the result); United States v. Wiesen, 56 MJ 172, 177 (2001)(Crawford, C.J., dissenting)(pet. for recon. filed Dec. 21, 2001).

All the members swore that their decision would be based on the evidence presented and the judge's instructions.  Under oath, they indicated they were not aware of anything at all that might raise a substantial question concerning their participation in this trial as court members.  We do not need to dismiss their sworn responses so effortlessly, especially when one looks at the extensive voir dire in the context of this case and defense tactics.  After appellant's causal challenge of all 1st Brigade members was denied, the member challenged by the defense peremptorily (MSG Geyer) was one who did not know of COL Brook's e-mail.

Finally, the majority is wrong when it criticizes the trial judge for not making "findings of fact and conclusions of law, nor ... analyz[ing] the evidence in accordance with the Biagase framework."  ___ MJ at (15).  Biagase does not require a military judge to make findings of fact and conclusions of law. Additionally, that rule is not to be found in any of the cases

9

from this Court that had been decided at the time of appellant's court-martial.

CONCLUSION

The thrust of COL Brook's e-mail, despite its bombastic tone, was to enhance leadership, eliminate noncommissioned officer incidents of drunk driving, encourage leaders to set a good example, and incorporate single and recently arrived soldiers in unit activities. A good digest of the e-mails can be found in the Army Court of Criminal Appeals opinion. 54 MJ 671-72.

Notwithstanding appellant's failure to show sufficient facts that constituted improper command influence, the Government "produced" evidence during voir dire by showing that none of the e-mails had any impact on the members. This was reinforced by the members saying that the brigade commander was shooting from the hip. Three of the members testified that COL Brook had no business telling them what their duties were as court members, and that he (COL Brook) did not have the same set of values as they. See, e.g., LTC Withers's voir dire responses, supra at (4). Said differently by MSG Peele when talking about COL Brook's December 23 briefing and email: "I don't need a Colonel to tell me how to do my duties, ma'am, I can do them on my own; and I think he could take a message from me."

10

Finally, this is a good case to show the importance of remedial action by a staff judge advocate -- the type of action which the majority discourages with their holding.  Once the staff judge advocate discovered that COL Brook had sent the first e-mail to members of his command, he ensured that remedial action was taken through the second e-mail.  The remedial action of the second e-mail put the first e-mail in perspective.  As COL Brook said in his second e-mail:

> Let me make something else perfectly clear.
> Nothing in what I have said in this or the
> earlier e-mail, or what I said at the Leader
> Training, has anything to do with what any
> soldier does as a member of a court-martial panel
> or as a witness before a court-martial.  The
> sworn duty of any court-martial panel member is
> to follow the instructions of the military judge,
> apply law to admissible facts, and decide a
> sentence based solely on the evidence presented
> in court.  Nothing said outside a court-martial
> by anybody, TO INCLUDE ME, may have any bearing
> on the outcome of any given case or sentence.

54 MJ at 678.

Whether this case is decided under pre-Biagase law or that set forth in Biagase, appellant has failed to prove or produce the quantum of evidence required to raise the issue of unlawful command influence and, thus, shift the burden to the Government to refute the facts, to show that the facts do not constitute unlawful command influence, or that command influence did not taint the proceedings.

For these reasons, I dissent.

11