# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

### Senior Airman DAVID J. JANSSEN
### United States Air Force

### ACM 37681 (rem)

### 9 September 2014

Sentence adjudged 13 December 2009 by GCM convened at Malmstrom Air Force Base, Montana. Military Judge: Don M. Christensen.

Approved sentence: Bad-conduct discharge, confinement for 9 years, and reduction to E-1.

Appellate Counsel for the Appellant: Lieutenant Colonel Gail E. Crawford; Major Christopher D. James; Major Michael S. Kerr; Major Daniel E. Schoeni; Captain Jeffrey A. Davis; and Dwight H. Sullivan, Esquire.

Appellate Counsel for the United States: Lieutenant Colonel Linell A. Letendre; Major Daniel J. Breen; Major Deanna Daly; Major Scott C. Jansen; Major Tyson D. Kindness; Major Naomi N. Porterfield; and Gerald R. Bruce, Esquire.

Before

ALLRED, MITCHELL, and WEBER
Appellate Military Judges

OPINION OF THE COURT
UPON REMAND

This opinion is subject to editorial correction before final release.

PER CURIAM:

Contrary to his pleas, the appellant was convicted by a general court-martial composed of officer members of one specification of violating the order of a superior noncommissioned officer; one specification of rape; two specifications of assault consummated by a battery; one specification of obstruction of justice; and one

specification of breaking restriction, in violation of Articles 91, 120, 128, and 134, UCMJ, 10 U.S.C. §§ 891, 920, 928, 934.[1]  The members sentenced the appellant to a bad-conduct discharge, confinement for 12 years and 8 months, forfeiture of $1,300.00 pay per month for 12 years, and reduction to E-1.  On 21 June 2010, the convening authority approved only so much of the sentence that called for a bad-conduct discharge, confinement for 9 years, and reduction to E-1.

*Procedural History*

On 25 January 2013, The Judge Advocate General of the Air Force appointed Mr. Laurence M. Soybel to the position of appellate military judge on the Air Force Court of Criminal Appeals pursuant to Article 66(a), UCMJ, 10 U.S.C. § 866(a).  At the time of this appointment, Mr. Soybel, a retired Air Force officer and former appellate military judge, was serving as a civilian litigation attorney in the Department of the Air Force.  On 25 June 2013, the Secretary of Defense, "[p]ursuant to [his] authority under title 5, United States Code, section 3101 *et seq*.," issued a memorandum that "appoint[ed] Mr. Laurence M. Soybel, a civilian employee of the Department of the Air Force, to serve as appellate military judge on the Air Force Court of Criminal Appeals."  Memorandum from Sec'y of Def. Chuck Hagel for Sec'y of the Air Force Eric Fanning (25 June 2013).

The case was initially docketed with this Court on 24 June 2010.  The appellant filed his assignment of errors on 19 January 2011 and a supplemental assignment of errors on 23 March 2011.  On 20 July 2011, this Court granted the appellant's motion to return the case to the convening authority for the preparation of a substantially verbatim record of trial.  A new transcript was prepared, and the convening authority issued a new action in this case on 2 April 2012.  Consistent with the original action, the new action approved only so much of the sentence as called for a bad-conduct discharge, confinement for 9 years, and reduction to E-1.

Initially, the appellant raised five issues, asserting:  (1) the evidence is factually insufficient to support his conviction for rape; (2) the evidence is factually and legally insufficient to support his conviction for breaking restriction; (3) Specifications 3 and 4 of Charge IV fail to state offenses; (4) the sentence is inappropriately severe because of unreasonable post-trial delay; and (5) trial defense counsel provided ineffective assistance of counsel.[2]

On 9 May 2013, we issued a decision in which we set aside and dismissed Specifications 3 and 4 of Charge IV (obstructing justice and breaking restriction, respectively), affirmed the remaining findings, and affirmed the sentence.  *United States*

---

[1] The appellant was acquitted of one specification of communicating a threat and one specification of obstructing justice, alleged in violation of Article 134, UCMJ, 10 U.S.C. § 934.

[2] The first and final issues were raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

*v. Janssen*, ACM 37681 (f rev) (A.F. Ct. Crim. App. 9 May 2013) (unpub. op.). Mr. Soybel was a member of the panel that decided the case. Following Mr. Soybel's appointment by the Secretary of Defense on 25 June 2013, we reconsidered the decision sua sponte and on 22 July 2013 issued a new opinion upon reconsideration, reaching the same conclusion as the previous opinion. *United States v. Janssen*, ACM 37681 (recon) (A.F. Ct. Crim. App. 22 July 2013) (unpub. op.).

On 19 December 2013, our superior court granted the appellant's petition for review to determine whether Mr. Soybel had been properly appointed. *United States v. Janssen*, 73 M.J. 136 No. 14-0130/AF (Daily Journal 19 December 2013). On 15 April 2014, our superior court issued its decision in this case, *United States v. Janssen*, 73 M.J. 221, 225 (C.A.A.F. 2014), holding that the Secretary of Defense did not have the legislative authority to appoint appellate military judges and that his appointment of Mr. Soybel to this Court was "invalid and of no effect." Our superior court reversed our decision in this case and remanded it to us for further review under Article 66, UCMJ, 10 U.S.C. § 866.

In light of this ruling by our superior court, we have reviewed the appellant's case. Our review includes the appellant's previous filings and the previous opinions issued by this Court, as well as a supplemental assignment of errors wherein the appellant asserts: (1) he is entitled to relief due to excessive post-trial processing delays, and (2) the military judge erred by denying the defense motion to dismiss charges due to unlawful command influence (UCI).[3] Finding error, we dismiss Specifications 3 and 4 of Charge IV (obstructing justice and breaking restriction, respectively), affirm the remaining findings, and affirm the sentence.

*Background*

In January 2009, the victim, Ms. BS, moved to Great Falls, Montana, to be with the appellant. BS and the appellant had previously dated when they both lived in Minnesota. They broke up, reunited on Facebook in 2007, and by January 2009 they were living together in a relationship that involved sex once or twice a day. BS described the beginning of their relationship as "very sweet," but it later turned "very rocky" as the appellant became, in her words, "very controlling." BS also testified that they had many arguments, and she had, on occasion, tried to leave the appellant after some of their arguments, but often the appellant would stop her by taking her keys, phone, or her clothes out of her bag. Additionally, she stated they often would engage in "make-up" sex after an argument.

One of those arguments occurred on 15 February 2009. BS testified that she knew that morning "it was going to be a day of walking on eggshells" because the appellant

---

[3] This issue was also raised pursuant to *Grostefon*.

had started talking to her in a loud voice. She went shopping for some diapers for her son and the appellant's daughter. While shopping, BS had an angry phone conversation with her father, which led to a telephonic argument with the appellant that continued when she returned home. When she got home, BS tried to check on her son, but the appellant prevented her from doing so by barricading the kitchen area with some chairs. As their argument continued, the appellant pushed BS into the bedroom. BS testified that she struggled, trying to get away through the bedroom window and door, but the appellant used some "wrestling techniques" to pin her to the bed.

At some point, the appellant let BS sit on the edge of the bed, but he would not let her leave the bedroom. She testified that the appellant began to shove her hard enough to nearly knock her off the bed. The appellant than pulled her back onto the bed and began to kiss her, but BS resisted by clenching her teeth. BS then testified as follows:

> [H]e had lift[ed] my shirt up and he . . . kiss[ed] on my neck and he had lifted my shirt up and started kissing on my breasts and then . . . he started to take off my pants and I told him no and he didn't say anything. And I said no again and he said, "What does no mean? No like you don't want to or no like please don't stop." And I said, "No, I don't want to." And as that conversation happened, he continued and at that point . . . in my mind I was thinking, "Shut the door, shut the door, shut the door."[4] And I remember him straddling on top of me and I was trying to thrust him off with my hips, trying to push him off with my hands on his shoulders.

BS further stated that she could not push the appellant off her because he was too strong. The appellant penetrated her vagina with his penis, and, after having sex with her, "[h]e just finished, got up, and walked into the kitchen." As BS was putting on her pants, the appellant came back into the room. She grabbed a nearby pen and threatened to stab the appellant. A scuffle ensued, and the appellant buckled her hands using a belt and later tied her wrists with a rope. When the appellant left the room to check on BS's son, she broke free and ran out of the bedroom. Once she got out of the house, she called 911.

Local law enforcement officers arrived on the scene and arrested the appellant. After being advised of his rights, the appellant admitted to engaging in a verbal and physical assault with BS:

> [P]robably towards the beginning . . . we were arguing a little bit, she had her hand on the door, [and] I was trying to . . . figure out what was going on[. She was] trying to get out the window out of the room and then she

---

[4] BS testified this was a dissociative technique she used to cope with traumatic situations. It allowed her to escape a traumatic experience in her mind while still perceiving the event as it occurred: "the connection between the event and [her] emotions and everything else is separate." She testified she learned this technique from another situation that had nothing to do with the appellant.

was just sitting on the bed [in the bedroom], and I just went and sat next to her. She wasn't saying anything; she was just sitting there, and I tried to get her calm. I went and sat next to her and I was like what's wrong? I put my arm around her and I was kissing her and she was kissing back and she helped me lift her shirt up, you know, that's not like she was really struggling, and then . . . I guess, she wasn't really doing anything she was just kind of laying there and like I said she pulled her shirt up, she lifted her legs up, she didn't really push me away. So I guess I wasn't really sure what was going on and I told her . . . "You know you can say no" and she said, "No" and I said, "No, what" she said, "No, I don't want to" and I said, "Don't want to say no or don't want to have sex" and she didn't say anything, and . . . I was already into it and that was it.

When asked if BS enjoyed the sex, the appellant stated "[S]he was just kind of laying there." When asked what this meant, the appellant explained:

[O]ne time she grabbed my legs and I -- I mean she wasn't just totally like -- she wasn't like sleeping or a dead person would be or anything, but no it wasn't like normal sex, and that's why I said that and maybe I should have stopped then, but I guess I didn't think. You know, I figured if she didn't want to she would have said no -- pushed me away . . . or made it clear especially when I asked her "Do you mean no you don't want to have sex or no you don't want to say no" and she didn't say anything.

When detectives challenged his story, the appellant admitted that having sex with BS at that time "probably wasn't a smart decision."

*Factual Sufficiency of the Rape Conviction*

The appellant first argues that the evidence is factually insufficient to support his conviction for rape. Specifically, the appellant argues that the Government bore the burden of proving beyond a reasonable doubt that mistake of fact as to consent did not exist in this case and failed to do so. The appellant asserts that we must, therefore, set aside his rape conviction.

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence

constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The evidence is legally sufficient to support the appellant's conviction for rape. As discussed supra, BS and the appellant had a telephonic argument while BS was shopping that continued once she returned home. The appellant kept BS from accessing her son by barricading the kitchen. The appellant pushed BS into the bedroom, where she tried to escape through the window before being stopped by the appellant. After being pushed and shoved, BS eventually sat on the bed with the appellant as he tried to kiss her. BS tried to resist the appellant's advances but found him too persistent. BS told the appellant "no" twice. BS tried to push the appellant off her before he penetrated her vagina but found him to be too strong. The appellant later restrained BS with a belt and rope after the altercation and after she tried to stab him with a pen.

The members had before them the testimony of BS, the 911 recording, the testimony of the responding officer and local detectives, the appellant's videotaped interview, and other physical evidence. In addition, the military judge properly instructed the members on the elements of rape as well as the definitions of force, consent, and mistake of fact as to consent. The members were in a position to weigh and assess the credibility of the witnesses and determine whether or not the appellant's claim of mistake of fact was reasonable. Moreover, the evidence need not be free of all conflict for a rational factfinder to convict an appellant beyond a reasonable doubt. *See United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). The members "may believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979). After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

*Article 134, UCMJ, Specifications and the Terminal Element*

In Specification 3 of Charge IV, the appellant was charged and convicted of obstruction of justice by using BS's Facebook account to send a fictitious electronic message.[5] In Specification 4 of Charge IV, the appellant was charged and convicted of breaking restriction after being restricted to the limits of Malmstrom Air Force Base (AFB). Although not challenged at trial, the appellant now argues that each specification fails to state an offense because neither—expressly or by necessary implication—alleges the terminal element required for an Article 134, UCMJ, offense. We agree.

---

[5] As charged, Specification 3 of Charge IV read in part that the appellant did "wrongfully endeavor to impede an investigation . . . by deleting records of electronic communication between [himself] and [BS] and by using [BS]'s Facebook account to send a fictitious electronic message denying [his] involvement in physically abusing [BS]." The members found the appellant guilty, but excepted the words "by deleting records of electronic communication between [the appellant] and [BS] denying [the appellant]'s involvement in physically abusing [BS]." The members found the appellant not guilty of the excepted words.

Whether a charged specification states an offense is a question of law which we review de novo. *United States v. Crafter*, 64 M.J. 209, 211 (C.A.A.F. 2006). "A specification states an offense if it alleges, either expressly or by implication, every element of the offense, so as to give the accused notice and protection against double jeopardy." *Id.* (citing *United States v. Dear*, 40 M.J. 196, 197 (C.M.A. 1994)). *See also* Rule for Courts-Martial 307(c)(3). In the case of a litigated Article 134, UCMJ, specification that does not allege the terminal element but which was not challenged at trial, the failure to allege the terminal element is plain and obvious error, which is forfeited rather than waived. *United States v. Humphries*, 71 M.J. 209, 214–15 (C.A.A.F. 2012). The remedy, if any, depends on "whether the defective specification resulted in material prejudice to [the accused's] substantial right to notice." *Id.* To determine whether the defective specification resulted in material prejudice to a substantial right, this Court "look[s] to the record to determine whether notice of the missing element is somewhere extant in the trial record, or whether the element is 'essentially uncontroverted.'" *Id.* at 215–16 (quoting *United States v. Cotton*, 535 U.S. 625, 633 (2002)).

In accordance with *Humphries*, we are compelled to disapprove the findings of guilty to the obstruction of justice specification and the breaking restriction specification alleged under Charge IV as a violation of Article 134, UCMJ. Neither specification alleges the terminal element, and neither side mentioned the terminal elements during the trial. We find nothing in the record to satisfactorily establish notice of the need to defend against the terminal elements, and there is no indication the evidence was uncontroverted as to the terminal elements.

On consideration of the entire record and pursuant to *Humphries*, the findings of guilty to Specifications 3 and 4 of Charge IV are set aside and dismissed.[6]

*Ineffective Assistance of Counsel*

The appellant alleges his trial defense counsel were ineffective for failing to (1) introduce evidence in findings, under Mil. R. Evid. 412, that BS was raped by her brother as a child, which led to her "dissociative state"; (2) introduce prior inconsistent statements of BS; or (3) introduce evidence from the appellant's ex-wife about the demeanor of BS a few hours after the assault and rape. The appellant submitted a post-trial affidavit to support his claim of ineffective assistance of counsel. In turn, the Government countered with affidavits from the appellant's two trial defense counsel.

---

[6] Because we dismiss and set aside Specifications 3 and 4 of Charge IV, we need not address the appellant's assignment of error challenging the legal and factual sufficiency of Specification 4 of Charge IV.

This Court reviews claims of ineffective assistance of counsel de novo. *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009). When reviewing such claims, we follow the two-part test outlined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007). Our superior court has applied this standard to military courts-martial, noting that "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687; *Mazza*, 67 M.J. at 474).

Judicial scrutiny of a defense counsel's performance must be "highly deferential and should not be colored by the distorting effects of hindsight." *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000). When there is a factual dispute, appellate courts determine whether further factfinding is required under *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997). "[I]f the facts alleged [by the defense] would not result in relief" under *Strickland*, we may address the claim without the necessity of resolving the factual dispute. *Ginn*, 47 M.J. at 248.

We have applied the standards in *Ginn* and conclude that we can resolve this issue without additional fact-finding. We find that the appellant's trial defense counsel executed effective trial strategies and tactics regarding the issues the appellant now raises. First, the military judge declined to admit evidence, under Mil. R. Evid. 412, related to BS being previously raped. Even without this evidence, trial defense counsel still conducted an effective cross-examination of BS regarding her dissociation technique. Second, trial defense counsel strategically chose not to offer recordings of some of BS's prior inconsistent statements. In their affidavits, defense counsel stated they knew she had made some recorded statements consistent with what the appellant told law enforcement during his interrogation. Because they considered BS's consistent statements harmful to their case, they decided that offering recorded inconsistent statements by BS would open the door for the Government to offer her consistent statements on rebuttal. They deemed this course of action "useless at best and detrimental at worst." Finally, trial defense counsel interviewed the appellant's ex-wife about her interaction with BS at the time of the rape but concluded that she did not offer any useful information. Examining the appellate filings and the record as a whole, we hold that the appellant was not denied effective assistance of counsel. *See Strickland*, 466 U.S. at 687.

*Post-Trial Delay*

Citing *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002), the appellant argues that the unreasonable post-trial processing in this case resulted in too severe a sentence and warrants relief. The appellant argues that this Court should reduce his confinement by one day for each day by which the 120-day standard for accomplishing the convening

authority's action set forth in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), was exceeded in this case. The appellant calculates his relief as 841 days, measured from the date the court-martial ended, 13 December 2009, to the date of the convening authority's second action, 2 April 2012.

In *Tardif*, our superior court held that Article 66(c), UCMJ, empowered the service appellate courts to grant sentence relief for excessive post-trial delay without showing actual prejudice, as is required by Article 59(a), UCMJ, 10 U.S.C. § 859(a). *Tardif*, 57 M.J. at 224. Having reviewed the legislative and judicial history of both Articles, the Court concluded that the power and duty to determine "sentence appropriateness under Article 66(c)" is distinct from and broader than that of determining sentence legality under Article 59(a), UCMJ:

> Article 59(a) constrains the authority to reverse "on the ground of an error of law." Article 66(c) is a broader, three-pronged constraint on the court's authority to affirm. Before it may affirm, the court must be satisfied that the findings and sentence are (1) "correct in law," and (2) "correct in fact." Even if these first two prongs are satisfied, the court may affirm only so much of the findings and sentence as it "determines, on the basis of the entire record, should be approved."

*Id.* (citing *United States v. Powell*, 49 M.J. 460, 464–65 (C.A.A.F. 1998)). The *Tardif* Court remanded the case to the lower court to determine whether relief was warranted for excessive post-trial delay, notwithstanding the absence of prejudice: "[A]ppellate courts are not limited to either tolerating the intolerable or giving an appellant a windfall. The Courts of Criminal Appeals have authority under Article 66(c) . . . to tailor an appropriate remedy [for post-trial delay], if any is warranted, to the circumstances of the case." *Tardif*, 57 M.J. at 225.

In *United States v. Brown*, 62 M.J. 602, 606–07 (N.M. Ct. Crim. App. 2005), our Navy and Marine Court colleagues identified a "non-exhaustive" list of factors to consider in evaluating whether Article 66(c), UCMJ, relief should be granted for post-trial delay. Among the non-prejudicial factors are the length and reasons for the delay, the length and complexity of the record, the offenses involved, and the evidence of bad faith or gross negligence in the post-trial process. *Id.* at 607. The *Brown* court found gross negligence due to a delay of almost 30 months from adjournment of trial until receipt of the record for review and subsequently disapproved the adjudged bad-conduct discharge. *Id.* at 607–08.

Although unfortunate, the delays in the present case ultimately ensured the appellant received a fair appellate review.[7]   Certainly, it would have been preferable to have had a fully accurate record of trial at the outset for this Court to review.  This also would have precluded the appellant's case from winding its way through two rounds of post-trial processing.  Even so, we find no evidence of bad faith or gross negligence in the post-trial processing of the appellant's case sufficient to prompt sentence relief.  Additionally, the other suggested factors in *Brown* do not cause us to exercise our power under Article 66(c), UCMJ, which would provide a windfall remedy to the appellant.

Additionally, the appellant alleges that post-trial delay following the convening authority's second action warrants relief, either under *Tardif* or as a due process violation for violating the standards set forth in *Moreno*.  We disagree.  We review de novo whether an appellant has been denied the due process right to speedy post-trial review and whether any constitutional error is harmless beyond a reasonable doubt. *United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006).   Under *Moreno*, a presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed before this Court. *See Moreno*, 63 M.J. at 142.  The *Moreno* standards continue to apply as a case remains in the appellate process.  *United States v. Mackie*, 72 M.J. 135, 135–36 (C.A.A.F. 2013). The *Moreno* standard is not violated when each period of time used for the resolution of legal issues between this Court and our superior court is within the 18-month standard. *See id*. at 136; *see also United States v. Roach*, 69 M.J. 17, 22 (C.A.A.F. 2010).

When appellate review is not completed at this level within 18 months of docketing, such a delay is presumptively unreasonable and triggers an analysis of the four factors elucidated in *Barker v. Wingo*, 407 U.S. 514 (1972), and *Moreno*. *See United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011).  Those factors are "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant."  *United States v. Mizgala*, 61 M.J. 122, 129 (C.A.A.F. 2005); *see also Barker*, 407 U.S. at 530.

This case was originally docketed for appellate review on 24 June 2010.  We granted the appellant's motion to remand the case to correct the record of trial on

---

[7] What follows is a summary of the key dates in this case leading up to the convening authority's second action.  The trial concluded on 13 December 2009, and the convening authority took action 190 days later, on 21 June 2010.  The case was initially docketed with this Court on 24 June 2010.  The appellant submitted his initial assignment of errors on 19 January 2011 and a supplemental assignment of errors on 23 March 2011.  On 20 July 2011, this Court remanded the record of trial to the convening authority to prepare a substantially verbatim record of trial.  The court reporter received the order to re-transcribe the record of trial on 7 September 2011, and completed the transcription on 16 September 2011.  Trial defense counsel completed her review on 27 January 2012, and trial counsel authenticated the record on 1 February 2012.  The staff judge advocate's recommendation (SJAR), defense request for clemency, and addendum to the SJAR were processed between 21 February 2012 and 27 March 2012.  The convening authority issued the second action on 2 April 2012, and the case was re-docketed with this Court on 11 April 2012.

20 July 2011, 13 months after docketing. The case was returned to us on 11 April 2012, and the appellant filed an assignment of errors on 28 September 2012. We issued our initial decision on 9 May 2013, 13 months after the case was returned to us. We then rendered a decision upon reconsideration on 22 July 2013. Our superior court granted review of this matter and set aside our decision on 15 April 2014, returning the record to this Court on 5 May 2014. After receiving additional briefs from the parties, our decision today has been timely issued following return of this case to our Court.

For the time leading up to our 22 July 2013 decision upon reconsideration, even assuming the entire three-year period since docketing is considered together, we see no basis for relief. We have examined the *Barker* factors and determine the appellant suffered no due process violation as a result of any delay in this matter. In particular, the appellant has made no showing of prejudice under the fourth *Barker* factor. When there is no showing of prejudice under the fourth factor, "we will find a due process violation only when, in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). Having considered the totality of the circumstances and the entire record, when we balance the other three factors, we find the post-trial delay in this case to not be so egregious as to adversely affect the public's perception of the fairness and integrity of the military justice system. We are convinced the error is harmless beyond a reasonable doubt.

As for the time that has elapsed since this Court's 22 July 2013 decision, we find no due process violation. The *Moreno* presumption of unreasonable delay is not triggered for this period, as each period of time used for the resolution of legal issues between this Court and our superior court is well within the 18-month standard. *See Mackie*, 72 M.J. at 136.

*Unlawful Command Influence*

The appellant claims that UCI occurred when Ms. SB, a family advocacy worker at Malmstrom AFB, Montana, "got in trouble for talking with the Area Defense Counsel," and was thereafter reluctant to cooperate with the defense.

Article 37(a), UCMJ, 10 U.S.C. § 837(a), states, in pertinent part:

No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

While statutory in form, the prohibition can also raise due process concerns, where, for example, UCI undermines an accused's right to a fair trial or the opportunity to put on a defense.

Allegations of UCI are reviewed de novo. *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006); *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999). The appellant, on appeal, bears the initial burden of raising UCI. The "appellant 'must show (1) facts, which, if true, constitute [UCI]; (2) show that the proceedings were unfair; and (3) show that [UCI] was the cause of the unfairness.'" *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999) (quoting *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999)). While more than a mere allegation or speculation is required, the initial burden of showing potential UCI is low. *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002). The level of evidence necessary to raise UCI is "some evidence." *Id.* (quoting *Biagase*, 50 M.J. at 150) (internal quotation marks omitted).

Once an issue of UCI is raised by some evidence, the burden shifts to the Government to rebut an allegation of UCI by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist, (2) the facts do not constitute UCI, or (3) the UCI did not have a prejudicial impact on the findings or sentence. *Biagase*, 50 M.J. at 151.

Allegations of UCI are reviewed for actual UCI as well the appearance of UCI. "Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an 'intolerable strain on public perception of the military justice system.'" *Stoneman*, 57 M.J. at 42–43 (quoting *United States v. Wiesen*, 56 M.J. 172, 175 (C.A.A.F. 2001)). The test for the appearance of UCI is objective. "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006). An appearance of UCI arises "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.*

About a week prior to the rape incident of which the appellant now stands convicted, the victim, BS, contacted Ms. SB. The victim asked about anger management classes for "her boyfriend," and she disclosed to Ms. SB a number of confidential matters. These included the fact that the appellant had physically abused BS, that BS had repeatedly called the police but then denied any abuse once they arrived, and that BS was seeking to leave the appellant.

Independent of matters related to the present case, Ms. SB had a history of problems related to her performance as a family advocacy worker. After receiving the call from the victim, there were indications Ms. SB may not have handled the situation correctly. Notes from the contact with Ms. BS should, for example, have been entered in

the family advocacy system of records but were instead lost or destroyed. Certain notifications to the appellant's unit under the Air Force Personnel Reliability Program should have been made but were not. When her supervisors learned that Ms. SB was subsequently interviewed by trial defense counsel, they were concerned she may have disclosed matters in violation of the Health Insurance Portability and Accountability Act (HIPAA). Eventually, Ms. SB's flight commander directed her via email to consult with the Medical Law Consultant before making any further disclosures and to have no contact with defense counsel except in the company of certain designated members from the unit.[8]

Upon receiving the evidence and argument of counsel, and after making detailed findings of fact, the military judge concluded, "I find no unlawful command influence. Even if there is unlawful command influence I don't believe the proper remedy in this case would be dismissal." We agree.

There is no indication that Ms. SB's flight commander, or other supervisors, had any interest in the outcome of this court-martial or wished to impede the defense in any way. A good faith desire to comply with HIPAA and a history of work-related issues appear to have led the flight commander to issue Ms. SB overly restrictive guidance regarding her communications with the defense. The situation was soon remedied, however. Ms. SB received proper advice from the Air Force legal community—that she was free to talk with the defense and that her participation in trial related matters would not be a HIPAA violation. She was further interviewed by trial defense counsel and reported she felt free to disclose all she knew. She later declared under oath that she would not feel inhibited in testifying fully and truthfully at trial.

Significantly, except for the UCI motion itself, Ms. SB had little if anything to offer at trial. The military judge noted correctly that, with a few possible exceptions, any testimony from Ms. SB would likely involve inadmissible hearsay. Trial defense counsel conceded that the chances of calling her to testify were "probably pretty unlikely." Ultimately, neither side deemed it necessary to call Ms. SB as a witness on findings or the sentence.

We find that the issue of UCI has been raised by the evidence in this case. We find beyond reasonable doubt, however, that the facts in this case do not constitute UCI and that UCI did not affect the findings or the sentence.

---

[8] Ms. SB's Group Commander, Colonel (Col) LD, was detailed as member of this court-martial. As a prophylactic measure, and with an eye towards avoiding any apparent unlawful command influence, and with the concurrence with both parties, Col LD was excused for cause.

*Sentence Assessment*

Reassessing the sentence on the basis of the errors noted, the entire record, and in accordance with the principles of *United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013), and *United States v. Sales*, 22 M.J. 305 (CM.A. 1986), we are confident the members would have imposed a sentence no less than the approved sentence of a bad-conduct discharge, confinement for 9 years, and reduction to E-1. Dismissing the obstruction of justice and breaking restriction specifications does not substantially change the sentencing landscape. The appellant still stands convicted of rape, assault consummated by a battery, and disobeying a lawful order, for which the maximum imposable punishment remains confinement for life. The gravamen of the appellant's misconduct is captured within the remaining charges and specifications, and this Court has experience and familiarity with the remaining offenses. This Court also finds that the sentence approved by the convening authority is appropriate for the remaining offenses.

*Conclusion*

The findings of guilty to Specifications 3 and 4 of Charge IV are set aside, and the specifications are dismissed. The remaining findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant remains. *See* Articles 59(a) and 66(c), UCMJ. Accordingly, the modified findings and sentence are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court