# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39458**

————————————

**UNITED STATES**
*Appellee*

v.

**Wesley M. JAMES III**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 31 October 2019

————————————

*Military Judge:* J. Wesley Moore (motions); Vance H. Spath (motions); Mark W. Milam.

*Approved sentence:* Dishonorable discharge, confinement for 11 months, and reduction to E-1. Sentence adjudged 22 December 2017 by GCM convened at MacDill Air Force Base, Florida.

*For Appellant:* Major Rodrigo M. Caruço, USAF; Major Meghan R. Glines-Barney, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before MINK, LEWIS, and D. JOHNSON, *Appellate Military Judges*.

Judge LEWIS delivered the opinion of the court, in which Senior Judge MINK and Judge D. JOHNSON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

LEWIS, Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of one specification of sexual assault of a child—

his stepdaughter AR—in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 11 months, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

Appellant raises five issues on appeal: (1) whether the evidence is legally and factually sufficient to support his conviction; (2) whether the military judge erred by failing to shift the burden of proof to the Government after the Defense raised some evidence of unlawful command influence (UCI); (3) whether the military judge erred by denying a motion to suppress DNA results after Appellant was pressured to consent to provide a DNA sample when he was interviewed in front of his wife, Staff Sergeant (SSgt) DJ; (4) whether the trial counsel committed prosecutorial misconduct during argument in the portrayal of AR's testimony; and (5) whether the Air Force Office of Special Investigations (AFOSI) committed UCI by seeking to intimidate AR to recant her explanation of what occurred.[3] We find no prejudicial error[4] and we affirm the findings and sentence.

## I. BACKGROUND

In June 2015, Appellant's stepdaughter, AR, gave birth to a baby girl who was placed for adoption directly from the hospital. At the time of the baby's birth, AR was 13 years old. At the time of the birth, the identity of the baby's father was shrouded in mystery, even to AR's biological mother, SSgt DJ, who was married to Appellant.

Months before the birth, when SSgt DJ learned her daughter was pregnant, SSgt DJ inquired about the father, but AR would not reveal his identity. Instead, AR told her family that one day after school, she and a boy from the school bus stop on MacDill Air Force Base (AFB) went into AR's on-base house

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*).

[2] The military judge acquitted Appellant of one charge and specification of failure to obey an order to not have any contact with AR, either directly or through a third party, in violation of Article 92, UCMJ, 10 U.S.C. § 892. We use the initials AR in this opinion, consistent with the charge sheet and authenticated transcript.

[3] Appellant personally asserts issues (3)–(5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] We considered issues (3)–(5) and they warrant no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

and had sexual intercourse. During the time that AR was pregnant, SSgt DJ and Appellant took no action to discover the identity of the "boy from the bus stop" or to attempt to identify the boy's parents. At trial, SSgt DJ testified she was concerned the boy's family might interfere with the adoption process and force AR to raise the child.

Almost a year after the birth, in March of 2016, a representative of the MacDill AFB Family Advocacy Office notified AFOSI that AR had given birth to a baby when she was only 13 years old. The representative learned this information from an investigator at the Hillsborough County Sheriff's Office (HCSO), Florida, who had interviewed AR in a separate matter.[5] As AR initially told the HCSO investigator that she was raped, Family Advocacy notified AFOSI. However, in a follow-up discussion, Appellant and SSgt DJ stated that the HCSO investigator misunderstood what AR was trying to tell her and there was no rape, only consensual sex with a "boy from the bus stop." Undeterred, AFOSI opened up an investigation and began their efforts to identify the "boy from the bus stop."

In the ensuing months, AFOSI's investigation turned into a stale or "cold" case as AFOSI could not identify a subject. AFOSI agents investigated several leads including an attempt to obtain school records and medical records for AR but their efforts were unsuccessful. AFOSI agents had AR look at past school yearbooks and she still could not identify the "boy from the bus stop."

In August 2016, Special Agent (SA) JB took over the investigation and met with Appellant and SSgt DJ at their house. SA JB believed Appellant and SSgt DJ could provide information about AR's social circle, church, and extracurricular activities which could be helpful to the investigation. During this interview, SA JB also asked both SSgt DJ and Appellant to consent to collection of DNA samples so they could be submitted for comparison. At this point, AFOSI had not obtained a DNA sample from the baby or AR. Both Appellant and SSgt DJ consented. Appellant's unique emotional response to being asked to provide a DNA sample, which included him breaking down and crying, is discussed more fully below.

Eventually, another AFOSI detachment obtained a DNA sample from the baby. SA JB also received four pictures of the baby, including a recent photo, from her adopted mother. SA JB described viewing these pictures as a turning

---

[5] A Hillsborough County Sheriff's Office investigator learned of AR's pregnancy while investigating a separate incident in March 2016 where Appellant disciplined AR with a belt and left visible bruising to AR's thighs and lower buttocks. Appellant told the investigator about AR's pregnancy to explain his reason for disciplining her as he recently learned AR had been "dating a boy." Appellant was not charged with an offense by the state of Florida or by the military for striking AR with a belt.

point in the investigation because the baby resembled Appellant. At this point, in November 2016, SA JB felt that Appellant could very likely be the baby's father. Within a few weeks, AFOSI obtained a DNA sample from AR and sent three DNA samples—AR's, Appellant's and the baby's—to the Armed Forces DNA Identification Laboratory for comparison testing. More than 18 months after the baby's birth, DNA testing showed Appellant was 274 trillion times more likely to be the father of AR's child than the average male of his race.

SA JB apprehended Appellant on 20 January 2017 shortly after AFOSI received the DNA results. After a rights advisement Appellant agreed to answer questions without a lawyer present. In a video-recorded interview, Appellant did not challenge the validity of the DNA results. Instead, Appellant admitted "[o]bviously I don't have a fighting leg to stand on, because, obviously, I'm here because the DNA results came back and obviously they're a match to me . . . ." After Appellant's multi-hour interview with AFOSI, his commander ordered him into pretrial confinement. By 20 January 2017, the DNA results disproved AR's story about the "boy from the bus stop." When AR testified as a witness for the Defense at trial, she admitted she lied about the "boy from the bus stop."

Shortly after Appellant's interview with AFOSI and his entry into pretrial confinement, AR began telling a second version as to how she became pregnant. We describe this as the "it felt like a dream" version. AFOSI agents learned about AR's "it felt like a dream" version 10 days after Appellant went into pretrial confinement during AR's child forensic interview which was conducted by Ms. JM at a local Child Protection and Advocacy Center in Tampa, Florida. AFOSI observed AR's child forensic interview and could communicate with Ms. JM through an earpiece. In that child forensic interview, AR explained that in what "felt like a dream" she saw a person who looked like Appellant, that her pants and underwear were off, and the "person that I saw in my dream that looked like [Appellant] he went on top of me." AR described that "it was something nasty that he did" and that she knew it was nasty because "I don't think that anybody else would do that."

The timeframe in which AR began telling the "it felt like a dream" version was contested at trial. The Prosecution posited that AR told this version the first time at her child forensic interview. The Prosecution further argued that AR only began telling this second version after Appellant spoke to his mother on the phone while in pretrial confinement and mentioned AR could maybe say she felt like she was having a dream. This call between Appellant and his mother was recorded by the civilian confinement facility and occurred the day before AR's child forensic interview. Specifically, Appellant told his mother "Um, I was talking to the two lawyers and that's exactly what they . . . they said nobody can . . . nobody can tell [AR] what to say or not to say something at all . . . anything. But, if she was to say something like she doesn't know if

something was happening, or maybe she felt like she was having a dream."[6] Appellant's mother interrupted him and reminded him the call was being recorded. The Defense's position was that AR had been telling the "it felt like a dream" version since Appellant was ordered into pretrial confinement and that Appellant knew this before the call between Appellant and his mother was recorded in the confinement facility because his mother told him about it during an earlier face-to-face visit.

At trial, the military judge admitted evidence of the recorded telephone call from the confinement facility for two limited purposes (1) as consciousness of guilt evidence for the allegation of sexual assault of a child; and (2) to impeach AR's credibility after AR testified in the defense case and provided a third version of how she became pregnant. In her testimony, AR said that she lied about the "it felt like a dream" version because she did not want to tell her mother the truth and, "I had to come up with something because everybody kept pressuring me."

AR's third version of how she became pregnant appeared about a month and a half after her child forensic interview. By this point, Appellant's commander preferred charges against him including the specification that he sexually assaulted AR by penetrating her vulva with his penis. In essence, in the third version, AR described sexually assaulting Appellant after he fell asleep from drinking alcohol. AR testified Appellant was wearing basketball shorts and spandex and that she pulled them down "halfway" that she "grabbed" his penis which was "soft" and moved her "hand up and down." Appellant's penis got hard and then she "put it in [her] vagina." AR testified Appellant did not move or talk and his eyes were closed. AR claimed the third version was the truth and that her father was in jail for something he did not do.

On cross-examination, trial counsel impeached AR with her prior testimony under oath during motion practice on whether Appellant's penis was actually "soft" when she pulled down Appellant's spandex.

> [Trial Counsel (TC)]: Do you remember a couple [of] days ago when you testified, didn't you tell the military judge at that point that when you pulled [Appellant's] spandex shorts down that his penis was hard? Do you remember saying that?
>
> [AR]: Yes.
>
> [TC]: So, how do you explain saying these two different things?

---

[6] This statement coupled with AR telling the "it felt like a dream" version at the child forensic interview the next day formed the basis for the alleged violation of a no-contact order. The military judge acquitted Appellant of violating the no-contact order.

[AR]: I didn't—umm . . . I meant to say that his penis was hard. That's what I meant by when I grabbed it.

[TC]: Okay.

[Military Judge (MJ)]: Wait. Wait. I lost you. You meant to say what?

[AR]: I meant to say that when I grabbed it I moved my hand up and down.

[MJ]: Okay. So, and it was soft?

[AR]: Yes, before I put it in my vagina.

[MJ]: Okay. I think we just—okay. All right. What did his penis look like when you pulled down his shorts?

[AR]: His penis was soft.

[MJ]: It was not erect?

[AR]: No.

[MJ]: And what happened then?

[AR]: And then I grabbed it and then I moved my hand up and down then that's when it got hard.

[MJ]: Which hand did you use?

[AR]: My right.

[MJ]: Okay. And then it got hard and then?

[AR]: And then I put it in my vagina.

To support their theory that Appellant could have sexual intercourse while he was asleep, the Defense elicited testimony from Appellant's wife, SSgt DJ, that she had engaged in sexual acts, including sexual intercourse, with Appellant while he was asleep. SSgt DJ could not remember Appellant ever ejaculating during the one to four times these sexual acts occurred. SSgt DJ indicated that she would tell Appellant the next day what she had done to him while he was asleep.

After SSgt DJ testified what she had done to Appellant while he slept, the Prosecution cross-examined SSgt DJ revealing that she was afforded the opportunity on a prior occasion to discuss this sexual activity with Appellant, but

did not. When SSgt DJ testified under oath earlier at a child custody deposition, she was questioned as to how she thought AR became pregnant.[7] SSgt DJ did not discuss this prior sexual activity with Appellant at the deposition even though, by the time of SSgt DJ's deposition, AR had already told SSgt DJ that she had sexual intercourse with Appellant while he was asleep. At the deposition, SSgt DJ did not volunteer any of the information she testified to at Appellant's trial—that she had sexual intercourse with Appellant while he was asleep—even when she was asked during the deposition, "What do you think happened between [AR] and your husband?"

At Appellant's trial, the military judge specifically questioned SSgt DJ about her deposition testimony stating, "that doesn't toggle your mind to say 'Holy cow, that's exactly what happened when I did it to him.'" SSgt DJ responded "No, sir. I didn't think like that."

The child custody deposition was not the only time that SSgt DJ did not think to raise the issue that Appellant was capable of sleeping through sexual acts with her. Well before the child custody deposition, on the day Appellant went into pretrial confinement, AFOSI permitted Appellant and SSgt DJ to talk. A video recording and transcript of their communication was admitted by the military judge as rebuttal evidence. During this recorded conversation, Appellant asserted to SSgt DJ that he did not knowingly or intentionally have sexual intercourse or consent to sexual intercourse with AR. SSgt DJ never mentioned or reminded Appellant how he was capable of sleeping through sexual acts with her as a possibility of what could have happened between Appellant and AR. Instead, when Appellant said AR may have "misconstrued something," SSgt DJ cut him off and said "[y]ou're hoping for something that might not be there."

Appellant testified in his defense and described the family's dynamics, history, and parental decision-making with AR both before and after her pregnancy. Appellant denied remembering a time when he had sex with AR and denied knowingly and voluntarily having sex with AR. Appellant testified that he would not and did not commit the offense. On cross-examination, Appellant was asked why he would not tell AFOSI that he had slept through sex with his wife before. His response was "At that point, I didn't feel it was important." Later, Appellant was asked "So, that never seemed important to you, is that right?" Appellant replied: "Not that it—I take that back. Not that it seemed important to me. It's just that I did not think of that at the time . . . ."

---

[7] SSgt DJ remembered testifying under oath, but did not recall the exact date or time of the deposition, only that it "could have been" in August of 2017. This deposition appears to be related to a 7 February 2017 petition by the State of Florida to terminate Appellant's parental rights of AR and her infant brother.

In closing argument, the Prosecution pointed out notable inconsistencies in AR's third version of how she became pregnant and characterized this third version as "preposterous." The Prosecution argued there was no reasonable doubt that a "petite, unlubricated 12-year-old virgin" would be able to sexually assault Appellant in the manner she described. The military judge convicted Appellant of sexual assault of a child as charged.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In Appellant's case the elements of sexual assault of a child in violation of Article 120b, UCMJ, included the following: (1) that at the time and place alleged, Appellant committed a sexual act upon AR, to wit: penetrating[8] her vulva with his penis; and (2) that at the time of the sexual act, AR had attained the age of 12 years but had not attained the age of 16 years. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 45b.b.(3)(a).

A general intent[9] offense, like sexual assault of a child, has an implied mens rea that the accused intentionally committed the sexual act. *See United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019) (finding sexual assault by bodily harm under Article 120, UCMJ, 10 U.S.C. § 920, to be a general intent crime with an implied mens rea of intentionally committing the sexual act). We recognize that *McDonald* involved a different offense from the one in this case, but find its rationale on a general intent offense applicable nonetheless.

"Inferences . . . are a staple of our adversary system of factfinding." *County Court v. Allen*, 442 U.S. 140, 156 (1979). "It is often necessary for the trier of fact to determine the existence of an element of the crime – that is, an 'ultimate' or 'elemental' fact – from the existence of one or more 'evidentiary' or 'basic' facts." *Id.* (citation omitted).

"Admitting evidence tending to show the accused's consciousness of guilt is an accepted principle of military jurisprudence." *United States v. Borland*, 12 M.J. 855, 857 (A.F.C.M.R. 1981). "Findings may be based on direct or circumstantial evidence." Rule for Courts-Martial (R.C.M.) 918(c).

### 2. Analysis

We find the military judge was presented with sufficient evidence at trial to find the Prosecution proved both elements of the offense beyond a reasonable doubt. As to the first element, the DNA evidence provided compelling evidence that Appellant penetrated AR's vagina with his penis and ejaculated inside her vagina which led to the pregnancy and eventual birth of AR's and Appellant's baby. The second element was unquestionably proven as AR's doctor testified

---

[8] The Government charged penetration as the contact underlying the sexual act. *See* 2016 *MCM*, pt. IV, ¶ 45b.b.(3)(a)(i).

[9] We acknowledge the military judge used words "specific intent" in ruling on a R.C.M. 917 motion for a finding of not guilty. He described an appropriate instruction on intent for sexual assault of a child would be something like this: "The accused must have had the specific intent to knowingly and voluntarily engage in sexual intercourse with AR." The military judge noted these were "fairly hastily put together instructions." Even if we were bound by the military judge's understanding of the law at the time of his R.C.M. 917 ruling in our legal and factual sufficiency review, our conclusions would not change.

the baby was conceived in the days immediately before or immediately after AR's 13th birthday.

The remaining question for us to resolve is whether the Prosecution presented sufficient evidence of the implied mens rea that Appellant intentionally committed the charged sexual act for his conviction to be legally and factually sufficient. We find the consciousness of guilt evidence and reasonable inferences from the evidence presented, including the DNA results, provided sufficient evidence. In reaching this conclusion we are mindful that the military judge admitted the "it felt like a dream" version for two limited purposes and not for the truth of the matter asserted. We confined our consideration of the "it felt like a dream" version to the purposes for which it was admitted.

We provide additional background here to highlight three examples of Appellant's behavior available in the evidence presented to the military judge that supported the findings of guilt. We note each behavior occurred before the DNA results were known.[10] The behaviors include: (1) Appellant's interaction with Mr. KZ from the adoption agency; (2) Appellant's insistence that SSgt DJ, AR, and his mother should not see the baby; and (3) Appellant's emotional reaction when asked by AFOSI to provide a DNA sample.

### a. Interaction with the adoption agency's founder

Mr. KZ, the founder and director of the adoption agency, had one phone conversation with Appellant during the adoption process involving AR's baby. Mr. KZ recalled the phone conversation and testified about it during the Prosecution's case-in-chief. To better understand this one interaction, we provide some additional context regarding the adoption of AR's baby.

At the beginning of the adoption process, Mr. KZ's communications were exclusively with Appellant's mother. AR was living with Appellant's parents at the time because Appellant and SSgt DJ were deployed at the same location. Mr. KZ was visiting Appellant's parents' house and was explaining the adoption process on the phone to Appellant and SSgt DJ at their deployed location.

Mr. KZ explained the process of a birth mother assessment where someone, such as himself, would do an assessment of AR. Appellant began questioning Mr. KZ about the birth mother assessment to the point where Mr. KZ believed the inquiry was "more than curious, a little suspect," "odd," and "a little strange." Mr. KZ described doing 25 adoptions per year for 16 years at the adoption agency he founded. He was accustomed to dealing with protective and inquisitive fathers. Mr. KZ testified Appellant displayed more curiosity than normal and asked questions Mr. KZ typically did not get. Particularly, Mr. KZ

---

[10] The Prosecution argued Appellant's consciousness of guilt was apparent even earlier than the examples we choose to include in this opinion.

recalled Appellant wanting to know "what kind of questions would [AR] be asked and what type of person" would ask those questions.

In his testimony, Appellant confirmed that he was inquisitive with Mr. KZ and that he "wanted to know who was going to be talking to her and in what capacity they were going to be talking to her, what things she would have to do during this process." Appellant thought his questions were "fair" for someone who considers themselves, "a loving father." A rational factfinder could conclude Mr. KZ's assessment of Appellant's questions more reliable and find the questions more indicative of Appellant's concern that AR would be questioned by a professional who might easily recognize the improbability of the "boy from the bus" story and uncover what Appellant knew really happened.

Mr. KZ testified about his assessment of AR as well. At his first meeting with AR, Mr. KZ testified he found her to be "very guarded." When Mr. KZ did the birth mother assessment himself, AR told Mr. KZ the "boy from the bus stop" story. Based on AR's "demeanor" and "very juvenile innocence," Mr. KZ was "shocked that there could've been a sexual intercourse activity with a boy off the bus." Despite his shock that AR could have had sexual intercourse as she described to him, Mr. KZ did not investigate further as the birth mother assessment was not designed to be an invasive process. Prior to being contacted by AFOSI, Mr. KZ thought Appellant asked a lot of questions, but he did not suspect him of wrongdoing at that time.

Mr. KZ later met SSgt DJ in person at the second or third meeting at Appellant's parents' house. By that point, SSgt DJ had returned from her deployment and intended to stay in Florida until AR delivered the baby and the adoption was secured. Mr. KZ found it very unusual that no one in Appellant's family wanted to meet the adoptive family his agency chose and that Appellant and his family did not want contact afterwards with the adoptive family.

### b. Appellant's persistence that no one see the baby

Appellant was deployed when AR gave birth to the baby. SSgt DJ and Appellant's mother were present and accompanied AR to the hospital. AR delivered the baby via the surgical procedure known as a cesarean section (C-section). Under Florida law, the consent forms for the adoption could not be signed until 48 hours after the birth or upon medical discharge, whichever occurs first. Mr. KZ testified that because of AR's C-section, they had to wait 48 hours to sign the adoption consent.

Well before the baby's birth and while still deployed, Appellant told SSgt DJ that he did not want her to see the baby after birth. He also told SSgt DJ that he did not want AR to see the baby. Appellant told AFOSI that his mother wanted to go in the room and he had to explain to her, "No, we're not having

nobody, this is the plan we have, this is what we're doing." Appellant's mother was present at the hospital and stayed in the waiting area.

The issue of Appellant not wanting SSgt DJ to see the baby was discussed on the video-recorded interview described above when AFOSI permitted Appellant and SSgt DJ to talk. SSgt DJ and Appellant also discussed AFOSI's view that the recent photo of the baby looked just like Appellant. The transcript contains the following colloquy between Appellant and SSgt DJ.

> [SSgt DJ]: So why didn't you want me to see the baby?
>
> [Appellant]: What?
>
> [SSgt DJ]: Why didn't you want me to see the baby?
>
> [Appellant]: And I brought that up to him too because that's the first thing I thought about. I was like we came up – mostly it was me, I was like we came – the adoption agency came to us with a birth plan and whatever it is they call it and he asked me why and I told him I was like because I know my wife. I didn't want to become emotionally attached with the baby. I was like I didn't want my wife to become emotionally attached with the baby. I was like I didn't want [AR] to become emotionally attached with the baby. So that's the plan that was brought up and that's what we went with. And I can swear, and I swear to God on everything—
>
> [SSgt DJ]: Not on my kids. Don't swear on my kids because I don't know—like what do you do. As me, what do you do?
>
> [Appellant]: Trust me. I understand. Trust me. I understand but—
>
> [SSgt DJ]: They say the baby is the spitting image of you.
>
> [Appellant]: He put – I understand. He put the picture right here for the—and when I [saw] him unfolding the picture, I turned around and I went and I dropped in the corner and I cried and I—
>
> [SSgt DJ]: I [saw] the baby. Not here when we were at the hospital and you said do not see the baby.
>
> [Appellant]: I mean—
>
> [SSgt DJ]: I asked the adoption agency to send me a picture of the baby because I wanted to see but you know I never, I never thought about it. I never—that never crossed my mind. Okay.

We considered Appellant's rationale for no one seeing the baby. On its face, his rationale appears reasonable that he did not want SSgt DJ or AR to become emotionally attached to the baby. But, Appellant, from his deployed location, did not give SSgt DJ or his mother a choice in the matter. On the whole, Appellant's insistence that SSgt DJ and others not see the baby, under the circumstances of this case, could be more indicative of his consciousness of guilt. Drawing a reasonable inference, in the light most favorable to the Prosecution, a rational factfinder could conclude the evidence that Appellant wanted no one to see the baby showed Appellant knew the baby might resemble him, a fact Appellant needed to keep hidden. While SSgt DJ may not have been able to see the resemblance from the photo she received from the adopted mother after birth, Appellant's reaction to the more recent photo of the baby, at about 17 months old, confirmed AFOSI's assessment that the baby was now the "spitting image" of him.

### c. Appellant's reaction to request for DNA sample

As described above, in August 2016, Appellant and SSgt DJ spoke with SA JB after he took over as lead investigator. At the end of this discussion, Appellant agreed to provide a DNA sample. As mentioned above, AFOSI did not take a DNA sample from AR until months later in December of 2016.

During Appellant's testimony, the military judge inquired what Appellant was thinking when AFOSI asked for a DNA sample. Appellant replied "I knew why they were asking me for it" and "I knew at that point they had suspected the possibility of me being the father of [AR's child]." Appellant continued "[a]nd immediately I got emotional. I broke down. I started crying and they say that I hesitated [to consent]. Yes, there was hesitation there but I—the hesitation was because I knew that—what other reason why would you be asking for my DNA." Later, in response to other questions by the military judge, Appellant asserted that he had no reason to think his DNA would come back positive.

A rational factfinder could conclude Appellant's emotional reaction before providing a consensual DNA sample was highly probative consciousness of guilt evidence. If Appellant was truly not worried about the DNA results, there would be no need for him to break down emotionally and start crying. But he did. Upon weighing this evidence ourselves and making allowances for not having personally observed Appellant's testimony, we are unpersuaded that a breakdown of this magnitude was caused by a realization that he might be a suspect. Instead, we find it was evidence of consciousness of guilt, available to the military judge, which Appellant knew before his DNA was tested that it would reveal he fathered AR's baby. We now address the challenges Appellant makes to the legal and factual sufficiency of the evidence.

### 3. Appellant's Assertions

Appellant asserts *inter alia* the evidence was legally and factually insufficient because: (1) the military judge made an "unfortunate rush to judgment" and disregarded "unrebutted testimony" and decided the case based on the military judge's "emotional reaction" to the evidence; (2) the Prosecution failed to introduce any evidence of Appellant's specific intent to gratify his sexual desires; and (3) the Prosecution failed to introduce any evidence that Appellant knowingly penetrated AR's vulva with his penis and the inferences the military judge made to convict Appellant were unreasonable.

### *a. The military judge made an unfortunate rush to judgment*

Appellant asserts the military judge rushed to judgment and disregarded "unrebutted testimony" for "emotional reaction" to decide this case. We reject these claims.

The record of trial shows the opposite of a rush to judgment by the military judge. Instead, we observe two days of motion practice and a contested four-day military judge alone trial where the factfinder scrutinized the admitted evidence presented by each side and even recalled AR to testify after Appellant's testimony.

We also see no evidence the military judge "disregarded" unrebutted testimony. "Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted). While Appellant may not agree with the weight the military judge gave to some of the evidence the Defense presented, we find nothing to indicate the military judge disregarded unrebutted testimony or resorted to emotion to resolve Appellant's case.

### *b. No evidence of specific intent to gratify sexual desires*

In his next challenge, Appellant asserts, without citation, that the Prosecution needed to prove that Appellant specifically intended to gratify his sexual desires when he committed the sexual act of penetration of AR's vulva with his penis. We disagree with Appellant's interpretation of the law.

The definition of the term "sexual act" that applies in Appellant's case is "contact between the penis and the vulva . . . , and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight. . . . ." 10 U.S.C. § 920(g)(1)(A). This definition does not include an element that Appellant needed to have specific intent to gratify the sexual desire of any person. We decline to transport the specific intent language Appellant takes from 10 U.S.C. § 920(g)(1)(B) into a specification that alleges penetration of the vulva by the penis when the specification on the charge sheet does not explicitly list specific intent to gratify sexual desires as an element.

### *c. Evidence of knowing penetration and unreasonable inferences*

Finally, Appellant argues the Prosecution failed to introduce any evidence that Appellant knowingly penetrated AR's vulva with his penis. We disagree. The military judge was permitted to consider both direct and circumstantial evidence properly before him in findings. R.C.M. 918(c). In this argument, Appellant ignores the inferences that may be drawn from the DNA evidence and the consciousness of guilt evidence presented by the Prosecution as described above.

Appellant also argues the inferences drawn by the military judge to find him guilty were unreasonable. Essentially, Appellant argues it was an unreasonable inference that the DNA proved Appellant knowingly engaged in sexual intercourse with AR. We are not persuaded. There is no question the DNA evidence was central to this case, but it did not stand alone. As is often the case, a factfinder must draw on circumstantial evidence to determine questions of intent. From our review of the evidence, we conclude the military judge could reasonably infer that Appellant committed the charged sexual act with AR with the implied mens rea required for this general intent offense.

### 4. Conclusion

We acknowledge the defense presented evidence that, if believed, would either exonerate Appellant or perhaps at least raise reasonable doubt in the factfinder's mind. This includes: (1) the testimony of AR that she put Appellant's penis in her vagina while he was asleep; (2) Appellant's denials of remembering or committing the offense charged; (3) Appellant's testimony that he had slept through sexual acts with SSgt DJ; and (4) SSgt DJ's testimony that Appellant slept through sexual acts with her. The military judge was not required to accept this evidence at face value and believe it. Neither are we. We can see why the military judge chose to find this evidence unreliable based on prior inconsistent statements, some of which we described above. The military judge could also properly consider any particular witness's demeanor while testifying, motives to misrepresent, and bias in deciding what weight to give testimony of a particular witness.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of sexual assault of a child beyond a reasonable doubt. *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for sexual assault of a child is both legally and factually sufficient.

**B. Unlawful Command Influence**

**1. Additional Background**

The Defense filed a motion to dismiss alleging UCI by the MacDill AFB staff judge advocate (SJA), Lieutenant Colonel (Lt Col) RM, and deputy staff judge advocate (DSJA), Major (Maj) AT, for actions taken by them prior to Appellant's trial. The trial counsel opposed the motion to dismiss arguing the Defense failed to show "some evidence" of UCI that would require the burden of proof be shifted to the Government.

For Lt Col RM, the motion alleged that he improperly telephoned the first military judge detailed to Appellant's case (MJ1), ex parte, and attempted to influence MJ1 to not grant a continuance. The reason Lt Col RM called MJ1 was to provide information about Hurricane Irma which was projected to hit Florida and Lt Col RM believed MJ1 needed to have the latest information from the installation's crisis action team about the hurricane. As Lt Col RM's phone call came shortly after an R.C.M. 802 conference where a possible continuance was discussed with MJ1, trial defense counsel argued that Lt Col RM knew about the possible continuance and was trying to improperly influence MJ1's ruling. A day later, MJ1 granted the continuance, but not before both trial defense counsel and AR's special victims' counsel traveled to MacDill AFB.

For Maj AT, the motion alleged that she improperly called the senior military defense counsel for the Florida region, Maj JF, in an attempt to have Maj JF "mentor" the military trial defense counsel, Captain (Capt) DW, on deficiencies in the Defense's request for witnesses. Maj JF was not detailed to represent Appellant. Maj AT called Maj JF after the legal office had significant difficulties contacting a defense witness at the phone number Capt DW provided. Maj JF eventually notified Capt DW of the DSJA's concerns. Maj AT did not contact Capt DW at all prior to calling Maj JF.

The third and last military judge (MJ3) detailed to Appellant's case ruled on the UCI motion and presided over the trial of the case. Prior to ruling on the UCI motion, four witnesses testified, including Lt Col RM, Maj AT, Appellant's civilian trial defense counsel, Mr. JJ, and his military trial defense counsel, Capt DW. Prior to announcing his ruling, MJ3 considered email correspondence between Lt Col RM and the trial defense team about the trial date and conflicts with base exercises as well as the general court-martial convening authority's decision to substitute a defense expert. The issues with the trial date and base exercises were resolved before trial and the Defense received the expert witness they originally requested. However, prior to resolution, the communications between the SJA and civilian trial defense counsel were tense.

MJ3 ruled orally that "I don't find that the defense has met its initial burden" to show UCI. In his written ruling, the MJ3 made several findings of fact related to Lt Col RM including (1) Lt Col RM "did not know" that MJ1 was considering "whether to continue the trial to later" because of the hurricane; (2) MJ1 "notified the parties via email of his communications" with Lt Col RM; and (3) MJ1 decided to continue the case due to the imminent nature of the storm.

In addition to his findings of fact, MJ3 determined that the phone call from Lt Col RM to MJ1 was not an ex parte communication as it was an administrative matter to relay the expected weather conditions for the time of the court-martial. MJ3 found no improper manipulation of the criminal justice process which would have a negative effect on the fair handling and disposition of the case. He concluded that alerting a military judge of possible future weather conditions, as reported by an official government reporting agency, should not and would not give the public pause or concern. MJ3 made the same conclusions on Lt Col RM's interaction and email with the civilian trial defense counsel, finding no evidence Lt Col RM influenced civilian trial defense counsel to change course or strategy. MJ3 concluded the public perception would never find that military justice was strained or influenced by this minimal and inconsequential contact from the SJA.

On the actions of Maj AT, MJ3 found no evidence that the DSJA's contact somehow tainted the military justice process or impacted the trial or its fairness in any way. MJ3 noted "it was not a wise move" and "it certainly could have been handled differently (e.g. the DSJA could have just contacted military defense counsel and asked for good witness contact information)." MJ3 found no unlawful command influence, in fact or appearance. MJ3 recognized it was "an act of frustration on the part of the DSJA (and probably the result of tension between legal office personnel and the defense as trial preparations progressed for what became a heavily litigated court-martial)."

On appeal, Appellant argues MJ3's written ruling misunderstood and misapplied the law concerning UCI in three ways: (1) by using a "preponderance of the evidence" standard when Appellant only needed to raise "some evidence" of UCI; (2) by failing to apply the correct legal standard for apparent UCI; and (3) by using a prejudice-focused analysis for apparent UCI.

Government appellate counsel argues that (1) Appellant failed at trial to present "some evidence" of UCI; (2) MJ3 discussed and analyzed apparent UCI throughout his ruling and dedicated an entire law paragraph to apparent UCI; and (3) MJ3 correctly stated the law that apparent UCI does not require prejudice.

**2. Law**

"Allegations of unlawful command influence are reviewed de novo." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citations omitted). "Where an assertion of unlawful command influence is litigated at trial, we review the military judge's findings of fact under a clearly-erroneous standard, but we review *de novo* the legal question whether those facts constitute unlawful command influence." *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F. 2000) (citing *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994)). "On appeal, the accused bears the initial burden of raising unlawful command influence." *Salyer*, 72 M.J. at 423.

"Two types of unlawful command influence can arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful command influence." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017). Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id.* (citations omitted). In order to demonstrate actual UCI, the appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *Salyer*, 72 M.J. at 423 (citing *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999)). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)).

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

*Id.* (citing *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)).

Unlike actual UCI, a meritorious claim of an appearance of UCI does not require prejudice to an accused. *Boyce*, 76 M.J. at 248. "[W]hen an appellant asserts there was an appearance of unlawful command influence[,] [t]he appellant initially must show 'some evidence' that unlawful command influence occurred." *Id.* at 249 (footnote omitted) (quoting *Stoneman*, 57 M.J. at 41) (additional citation omitted). "Once an appellant presents 'some evidence' of unlawful command influence, the burden then shifts to the government to. . . . prov[e] beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence." *Id.* (quoting *Salyer*, 72 M.J. at 423) (additional citation omitted). If the Government fails to rebut the appellant's factual showing, it may

still prevail if it proves "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding.'" *Id.* at 249–50 (alteration in original) (quoting *Salyer*, 72 M.J. at 423).

The United States Court of Criminal Appeals for the Armed Forces "has long recognized that Article 37(a) prohibits unlawful influence by *all persons subject to the UCMJ*." *United States v. Barry*, 78 M.J. 70, 76 (C.A.A.F. 2018) (citing *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004)). The test for unlawful influence by an individual acting without the mantle of command authority is essentially the same as the test for unlawful command influence. *Id.* at 76–77.

### 3. Analysis

We adopt MJ3's findings of fact as they are not clearly erroneous. In our de novo review, we find Appellant failed to meet his burden to make an initial showing of "some evidence" of UCI.

Delving deeper into actual UCI, the actions of Lt Col RM were not "some evidence" of an improper manipulation of the criminal justice process which negatively affected the fair handling or disposition of Appellant's case. *Boyce*, 76 M.J. at 247 (citations omitted). Lt Col RM's decision to provide a weather update directly to the military judge was not an ex parte communication as it was on an administrative matter. While the initial burden of some evidence is low, mere allegation or suspicion is not enough. *Salyer*, 72 M.J. at 423 (citation omitted). In this case, the trial defense counsel merely suspected that Lt Col RM was trying to influence a continuance. This suspicion seems to be based on a separate call that Lt Col RM had with Capt DW where a continuance was discussed. In reviewing MJ1's summary of the interaction with Lt Col RM, we observe that MJ1 informed Lt Col RM that he promised counsel a decision on the continuance by close of business. Therefore, any suspicion about from whom Lt Col RM learned about the continuance should have been resolved, particularly as the defense presented no evidence that trial counsel had informed Lt Col RM about the R.C.M. 802 conference at all. In the end, MJ1 granted the continuance based on the weather and within a day of the Defense's initial request for the R.C.M. 802 conference. While it is unfortunate that the trial defense counsel team and special victims' counsel traveled to Florida only to have the case continued by weather, there is no evidence that traveling to MacDill AFB for pretrial preparation negatively impacted the fair handling or disposition of Appellant's case. Similarly, there is no evidence that

Lt Col RM's interaction and email with both trial defense counsel on other issues related to the trial date, base exercises, or a defense expert negatively impacted the fair handling or disposition of Appellant's case.

Also, assessing actual UCI with respect to the DSJA, the actions of Maj AT were also not "some evidence" of an improper manipulation of the criminal justice process which impacted the fair handling or disposition of Appellant's case. *Id.* (citations omitted). The error in the contact information for the defense witness was resolved before trial. The witness traveled and testified in sentencing. We observe no impact on Capt DW from the call he received from Maj JF. Maj JF did not even supervise or rate Capt DW's performance at the time of the call due to a permanent change of station by Capt DW. There was no evidence that Maj AT was attempting to dissuade the Defense from requesting witnesses for trial. Instead, we observe an attempt to ensure the Defense received the witnesses requested on time despite an error in the contact information provided.

Turning to apparent UCI, we assess the actions of Lt Col RM and Maj AT together, as we believe the objective, disinterested observer would do so after being fully informed of the facts and circumstances. Even when the actions of Lt Col RM and Maj AT are taken together, we do not find "some evidence" that would place "an intolerable strain" upon the public's perception of the military justice system. *Boyce*, 76 M.J. at 249–50 (alteration in original) (quoting *Salyer*, 72 M.J. at 423). We can barely discern any strain at all, let alone "some evidence" of an intolerable strain, upon the public's perception of the military justice system. After being fully informed of all the facts and circumstances of the combined effects of Lt Col RM and Maj AT's actions, we find an objective, disinterested observer would simply conclude that certain portions of the pretrial processing of this case became unnecessarily contentious and that Lt Col RM and Maj AT were not the only individuals responsible for this phenomenon. There was not "some evidence" presented that would lead an objective disinterested observer to harbor a significant doubt about the fairness of Appellant's proceeding.

Moving to Appellant's specific challenges on appeal, we agree that MJ3's written ruling uses the words "preponderance of the evidence." We note that R.C.M. 905(c) states "unless otherwise provided in the Manual, the burden of proof on any factual issue the resolution of which is necessary to decide a motion shall be by a preponderance of the evidence." We agree that MJ3's written ruling should have been more precise in stating the preponderance of the evidence standard only applied to his findings of fact. As we do a de novo review of UCI allegations on appeal and the law requires Appellant to raise "some evidence" of UCI, we need not further analyze MJ3's word choice in his introductory paragraph of his written ruling.

We resolve Appellant's final two challenges to MJ3's UCI ruling in a similar manner. On a careful reading of the military judge's ruling, we see where Appellant observed some crossover of actual UCI legal concepts, including prejudice, into the apparent UCI analysis. We also agree with the Government that the concepts are laid out separately in the military judge's written ruling in his "Law" section. As we are conducting a de novo review of whether there was "some evidence" of UCI and we find none, no further discussion is necessary.

Our finding that Appellant did not present "some evidence" of UCI, should not be taken as an endorsement of the actions of Lt Col RM and Maj AT. A wing SJA should always be mindful how even administrative contact with a military judge may appear suspicious to others. Similarly, a wing SJA should always take the high ground when it comes to civility with defense counsel and exercise caution before stepping into a role more suited for detailed trial counsel. Finally, DSJAs should attempt to resolve errors in witness travel requests, even frustrating ones, at the lowest possible level.

### III. Conclusion

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court